Stoddard H. PYLE, Plaintiff,

v.

The WOLF CORPORATION et al., Defendants.

Robert W. HILL, Plaintiff,

v.

The WOLF CORPORATION et al., Defendants.

Robert E. STALEY, Plaintiff,

v.

The WOLF CORPORATION et al., Defendants.

Arthur J. LEWIS, Plaintiff,

v.

The WOLF CORPORATION et al., Defendants.

Civ. Nos. 70–693 to 70–696.

United States District Court, D. Oregon.

Oct. 22, 1972.

---

Bruce M. Hall, Kenneth M. Novack, Rives, Bonyhadi & Hall, Portland, Or., for plaintiffs.

Clifford N. Carlsen, Jr., John R. Bakkensen, Miller, Anderson, Nash, Yerke & Wiener, George H. Fraser, Portland, Or., for defendants.

## OPINION

SKOPIL, District Judge:

## I

## INTRODUCTION

This is an action for breach of an executory accord. The plaintiffs are four individuals who among themselves invested $1,000,000 in a venture with defendant Wolf Corporation (hereinafter, "Wolf") whose business is real estate, oil and gas exploration, and related enterprises.

In 1969 a partnership known as "Wolf 69" was formed for the purpose of exploring for oil on land in which Wolf had acquired an interest from King Resources Company. Wolf was the general partner and exercised managerial control over Wolf 69. The limited partners were obligated to contribute approximately $3,100,000 to finance the intangible expenses of exploration. The arrangement had substantial tax advantages for them. Apparently it was intended that there be two limited partners, Gordon S. Giovanelli and Lawrence E. Mc-Combs. Giovanelli furnished his share, $1.5 million, but McCombs had some difficulty in furnishing his $1.6 million. The Fox-Raff Company, a Seattle stock brokerage firm, sought other investors to take up the $1,000,000 which McCombs could not finance. The nature of the interest which plaintiffs thus purchased is a matter of dispute between the parties. Plaintiffs claim that they are limited partners in Wolf 69, and defendant Wolf apparently regards them only as purchasers of part of McComb's interest.

Approximately one year later, plaintiffs were dissatisfied with their investment and began identical lawsuits seek-

ing various forms of relief.[1] There were a number of defendants in addition to Wolf, including Wolf's officers and directors, King Resources, its officers and directors, two additional corporations which were associated with Wolf, their officers and directors, and others. The complaint alleged violation of various securities laws and regulations as well as fraud and other claims. In March of 1971, the complex litigation apparently was under full steam with numerous discovery proceedings under way.

About this time Wolf commenced serious overtures to plaintiffs seeking a settlement of the lawsuit. One of its principal motivations was its desire to make a public offering of securities, the success of which it felt required disposition of plaintiffs' lawsuit. On March 4, 1971, Harold Willits, an attorney with a substantial interest in Wolf and who shortly thereafter became its Vice President, wrote plaintiffs proposing a settlement for $200,000 cash and 200,000 shares of Wolf common stock (then worth approximately $5.00 per share over the counter). On March 10, Bruce Hall, an attorney for plaintiffs, made a counter offer for $700,000 cash and 145,000 shares of stock. On March 14, Willits responded with an offer of $500,000 cash and 100,000 shares of stock. On March 19, the parties interrupted a deposition, then in progress, in order to negotiate a settlement. This meeting was attended by Willits, who had come to Portland for that purpose; Robert L. Raff, an officer of Fox-Raff Company; Clifford N. Carlsen, Jr., Portland counsel for defendant; Bruce Hall, attorney for plaintiffs; and the plaintiffs Pyle, Hill and Staley.[2] Robert L. Raff accompanied Willits to Portland at the request of Giovanelli, then President[3] of Wolf, because it was anticipated that the basis of the settlement might involve the exchange of stock. During the course of a two-hour discussion, conducted principally between Willits and the plaintiffs Pyle and Hill, plaintiffs agreed to dismiss the lawsuit in exchange for the payment, in installments, of $700,000 in cash, 100,000 shares of unregistered Wolf common stock, the transfer of another 30,000 shares of stock into escrow with ultimate delivery made contingent upon future market performance, and the right to have their stock registered so that they could sell it later. It was also agreed that attorneys for the parties would draw up a written version of the agreement. Plaintiffs previously had scheduled to begin taking depositions of defendant's officers during the following week, but abandoned them because of the settlement. Participants on both sides of the settlement conference expressed mutual relief that it was over and settled.

The case had been set for calendar call the following Monday, March 22, 1971. Either on that date or on the preceding Friday after the meeting, it was reported to the court that the case had been settled. It was transferred to the calendar of cases awaiting final order (AFO Calendar). Also on March 22, Carlsen showed plaintiffs' attorneys the proposed draft he had made of the agreement.[4] It was his intention to capture in writing the terms and conditions which had been orally agreed upon, and to express in more precise detail some

1. The four cases were consolidated January 29, 1971.

2. The other plaintiffs apparently had authority to act for Lewis, who had the smallest interest in plaintiffs' combined investment, only 4%.

3. Giovanelli testified that he became President on March 15. Defendant furnished a list of its officers which showed that he became President on March 25. Wolf's 1970 Annual Report lists Giovanelli as President (and Willits as Vice President) "as of March, 1971." The accountant's certification contained therein was dated March 26, 1971, and consequently the March 25 date furnished by defendant is the last possible date consistent with its annual report. In any event, the Court need not resolve this discrepancy inasmuch as defendant did not really dispute the authority of Giovanelli and Willits to act in its behalf during this period.

4. Appendix A is the Carlsen draft.

of the terms. For example, the parties had agreed that the cash would be payable in installments and that promissory notes would be executed, representing those installments, and Carlsen drafted promissory notes which he attached at the end of the document. With respect to one term, the anti-dilution clause (discussed more fully *infra*), Carlsen was uncertain about the acceptability of his draft language and, consequently, he sent his version to Willits first without including it in the draft agreement.

George Rives, an attorney for plaintiffs and Hall's partner, found fault in several aspects of Carlsen's draft. He thereupon drafted his own version incorporating most of the provisions in Carlsen's draft but changing language and adding some other terms. On April 9, Willits sent a copy of the Rives redraft to Sheldon Halpern who was secretary of defendant and New York counsel, registering his objections to four provisions in the Rives redraft which he felt should either be clarified or changed.

From this point on there continued to be discussions among the parties about various aspects of the proposed written version of the agreement, but none was ever signed. However, defendant, on a number of occasions, reassured plaintiffs that the case was settled. For example, at a meeting in early May between Willits and plaintiffs, another lawyer accompanying Willits who indicated that the settlement was too generous was interrupted by Willits saying that the case was already settled and that there was a deal.

On June 21, the case was on the AFO Calendar for call. When the court (Belloni, J.) inquired of the status of the case, he was reassured by Carlsen that it had been settled and that no assistance of the court was required since it only "involved the security and tax lawyers just on the structure of settlement." At a later proceeding when Judge Belloni said he had understood from this exchange that the case was settled, Carlsen replied that he had thought so, too, and that it was his intention to so represent to the court.[5]

However, on June 29, 1971, the plaintiff Stoddard Pyle received a telephone call from Joe Wolf, Chief Executive Officer of defendant. Joe Wolf indicated that he wanted to renegotiate the terms, apparently thinking that they were too generous to plaintiffs. When Pyle protested that an agreement had already been reached, Joe Wolf responded by saying, according to Pyle's uncontradicted testimony, that "Mr. Willits and that attorney came down and settled the case, but I have the money." Thereupon, negotiations broke off and plaintiffs renewed their lawsuit, amending the complaint to add a cause of action against Wolf for breach of an executory accord. Shortly thereafter one of the defendants to the original complaint, King Resources, entered reorganization proceedings and an order of the bankruptcy court stayed further litigation, at least against King Resources. Plaintiffs moved for summary judgment on the new count, which motion was denied.

The issue presented by this added count for breach of an accord was segregated from the other counts and tried to the Court on July 5, 6, 7 and 10, 1972.[6] On August 16, 1972, the Court heard arguments of counsel for both sides.

Plaintiffs claim that on March 19, 1971, the parties entered into a binding and enforceable contract which was later breached. Defendant denies that the March 19 settlement was anything more

---

5. Defendant implied at one point that Carlsen had no authority to make this representation and that it was, therefore, not bound by it. The Court summarily rejects the notion that an attorney, retained by a client for the purpose of representing it in a particular case, has no authority to make representations about the case's status to the court.

6. The following exhibits on which the Court reserved ruling as to admissibility are irrelevant and have not been relied upon: Nos. 7, 12, 44, 52, 55, 56, 65, 67, 69, NN, OO, PP, QQ and RR.

than a tentative one, and that it was contingent upon further agreement on other additional material questions and upon the ultimate execution of a written contract. Defendant also maintains that even if there was a contract on March 19, it is unenforceable because contrary to the Statute of Frauds.

Plaintiffs' alternate position is that if an enforceable contract was not created, defendant is equitably estopped from denying it because of its subsequent behavior. In light of the ruling which the Court makes on plaintiffs' contract claim, the Court does not reach the issue of equitable estoppel.

## II

## THE EXISTENCE OF THE CONTRACT

■■ When adversaries in a lawsuit agree to settle it and to revise their contractual relations, the accord and compromise is enforceable provided that the requirements for formation of contracts are met. All States Investors, Inc. v. Bankers Bond Co., 343 F.2d 618 (6th Cir.), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); Ladd v. General Insurance Co., 236 Or. 260, 387 P.2d 572 (1963); Ohlson v. Steinhauser, 218 Or. 532, 315 P.2d 136, 346 P.2d 87 (1959). Courts frequently summarily enforce settlements of pending lawsuits. Cia Anon Venezolana de Navegacion v. Harris, 374 F.2d 33 (5th Cir. 1967). Compromise settlements are favored in law. Hartford Accident & Indemnity Co. v. Payne, 242 F.Supp. 888 (D.Or. 1965). They benefit both the parties litigant and the taxpayers. Woodbury v. United States, 232 F.Supp. 49 (D.Or. 1964), reversed in part, 359 F.2d 370 (9th Cir. 1966). Furthermore, the courts naturally have more confidence in arrangements which have been consented to by both sides than in orders issued at the conclusion of adversary proceedings.

### A.

■ As is true of other forms of contracts, an agreement to compromise a lawsuit and enter into an accord may be a valid contract even though it has not been reduced to writing. Autera v. Robinson, 136 U.S.App.D.C. 216, 419 F.2d 1197, 1198 n. 1 (1969). It may happen for various reasons that the mutual intention to agree on a written contract is thwarted, without affecting the validity of the contract. See, e. g., Kelly v. Greer, 365 F.2d 669 (3d Cir. 1966), cert. denied, 385 U.S. 1035, 87 S.Ct. 772, 17 L.Ed.2d 682 (1967); Theatre Time Clock Co. v. Motion Picture Advertising Corp., 323 F.Supp. 172, 175 (E.D.La.1971).[7] In cases such as this one where the parties to an alleged oral contract contemplate the later execution of a written agreement, the initial question in determining the existence of a contract is whether or not the parties intended to be bound and regarded the contemplated written agreement as a memorial of a prior contract, or whether they intended only to be bound upon the execution of a written, signed contract. Britt v. Thorsen, Or., 481 P.2d 352 (1971); Wagner v. Rainier Mfg. Co., 230 Or. 531, 371 P.2d 74 (1962). Since the plaintiffs contend that the parties did intend to be bound orally and the defendant denies it, the Court as trier of fact must resolve this dispute on the evidence submitted to it and according to an objective theory of contract.

In candor, there is evidence to support either conclusion. In support of defendant's position is the failure itself of the parties to sign a final version, and the subsequent maneuvering to include additional favorable terms and language.[8]

7. The question of the Statute of Frauds is discussed *infra* Part III.

8. Defendant also relies on the understanding that if the first payment were not made, plaintiffs would be free to pursue their original claims. This, it is argued, shows that the parties intended that the contract would come into force only upon the making of that payment. This is unpersuasive for two reasons. First, it is inconsistent with, and less probable than, defendant's position that the contract would become effective upon execution of

While it is not entirely clear, in the opinion of the Court the preponderance of the evidence points to an intention to be bound. First, the March 19 meeting was a long and serious discussion among plaintiffs, plaintiffs' counsel, defendant's counsel and agents. It was preceded by offers and counteroffers which progressively narrowed the gap between the parties on what they regarded as the essential terms, i. e., the amount of cash and stock and plaintiffs' registration rights. Second, the parties did agree on the material terms, including those just referred to.[9] At the conclusion of the meeting, it was understood that the agreement would be turned over to lawyers to put in written form. The Court infers the parties in their caution intended to make certain that the formalities of the settlement complied with the securities laws and took advantage of possible tax benefits. Third, both sides referred to the March 19 meeting as a settlement and so represented to the court. Plaintiffs so indicated, and obviously were of that opinion because they dropped work on their lawsuit and abandoned discovery and other pretrial matters. There is reliable evidence that each of defendant's three representatives at the meeting said it had been settled. Defendant's representatives on several occasions after March 19 reassured plaintiffs and the court that it was settled. Furthermore, after March 19, defendant began work on its stock registration which it had considered to be obstructed by the lack of a settlement with plaintiffs. Since the renewal of the lawsuit on this separate count, representatives of both sides have said that they were satisfied with the terms of the agreement as set forth in the Carlsen draft of March 22. Finally, there is no particularly credible evidence to support defendant's position that the failure to sign a final written version was attributable to any difference between the parties concerning the technicalities about which they were negotiating. Defendant's testimony that "there were so many changes in the thing that it just completely fell apart"[10] is not particularly persuasive. The most substantial changes were sought by defendant, which plaintiffs attempted to accommodate. From the evidence, it seems that the defendant had a change of mind by dishonoring the agreement previously reached. This inference is made probable by the fact there were actually two groups of officers in varying degrees of control of defendant, and it was the one group, principally Giovanelli and Willits, which entered into the agreement on behalf of defendant, and it was the other group, principally Joe Wolf, which dishonored it.

Accordingly, the Court finds that the parties expected to be bound by their understanding of March 19 and, thereafter, felt that they were, indeed, bound by it. What actually happened on March 19 and thereafter is neatly described in a standard authority:

> The evidence may be convincing that the parties intend to reduce their already consummated contract to writing as a mere "memorial" thereof and not as their only operative expression of assent. In such a case, the contract is valid even though they try and fail to agree upon the form and terms of the memorial. A letter of confirmation may omit a term previously agreed upon or may include a new and different term that now seems desirable. The other party may then try his hand and prepare a confirmation to which the first party will not assent. The result may be that there is no confirmation and no "memorial." Afterthoughts cannot be brought into the contract except by mutual assent; and the informal contract stands

a written version. Second, the most likely interpretation is that plaintiffs simply preserved their remedies against breach of the executory accord. See Ohlson v. Steinhauser, *supra*. It was plaintiffs'

performance, not their agreement to perform, which was postponed.

9. See subsequent discussion, Part II B.

10. Giovanelli deposition, p. 45.

as made. 1 A. Corbin, Contracts § 30, at 110 (1963).

### B.

■ In addition to the necessary intent of the parties to bind themselves, the formation of the contract requires objective agreement on its material terms. Defendant directs its strongest attack along these lines and maintains that there were a number of disputed material issues which remained unresolved at the conclusion of the meeting on March 19.

### (1)

### REGISTRATION PROVISIONS

■ The first essential element which defendant contends was not agreed to concerns the rights of plaintiffs with respect to the registration of the stock which they were to receive. It is defendant's position that these rights were to be the same as those accorded the limited partners under the Wolf 69 partnership agreement upon dissolution of the partnership and distribution of the stock. The Court agrees with defendant and finds no substantial dispute on this point. It seems likely that the apparent disagreement was only semantic. When plaintiffs denied the applicability of the Wolf 69 provisions, they were referring only to the requirement of furnishing investment letters [11] and not their rights to have the stock registered.

Willits' letter of March 4, 1971, invoked the Wolf 69 provisions and defendant's representatives of the March 19 meeting adhered to them. The substance of these were that after receiving the stock the plaintiffs would have the right to require Wolf to register the stock with the SEC at its own expense in order that plaintiffs could then dispose of it on the market. Plaintiffs also had the right to participate in any registration initiated by Wolf for its own

reasons. The disposition of the escrowed stock was conditional on its market price after registration. If it was above $20 per share, all shares would be returned to defendant. If it was above $10 per share, but below $20 per share, half would be returned to defendant and half turned over to plaintiffs. If it was below $10, all would be turned over to plaintiffs.

Although there was some testimony that plaintiffs may have sought a guarantee from the defendant that the registration would become effective by December 31, 1971, it is most doubtful that this was an unresolved dispute. It was clear to both sides that it was beyond the power of a registrant of securities to guarantee prompt favorable action by the SEC. The Carlsen draft provision for registration was taken almost verbatim from the Wolf 69 agreement [12] without a guarantee of any effective date for registration. The Rives redraft in response made no material alterations. It only made more precise the defendant's obligation to seek registration by requiring that the initial steps be accomplished within 90 days of the request from plaintiffs. This evidence shows rather clearly that both sides agreed that plaintiffs' registration rights would be in accordance with the Wolf 69 agreement and that there was no dispute about a registration guarantee. These terms were consistent with defendant's intent to carry out an SEC registration for a forthcoming issue of its securities. As stated previously, one of defendant's principal purposes in settling the lawsuit was to clear this obstacle.

■ In support of its argument on this point, defendant relies in part on the testimony that at the close of the March 19 meeting, it was said that there were tax and securities problems to be worked out.[13] The Court is satisfied, however, that in the context of an agreement to settle a major lawsuit in ex-

---

11. Discussed in ¶ (2) *infra.*

12. Appendix B reproduces ¶ 15 of this agreement.

13. One version of this statement was that there were some tax and securities problems defendant had to take care of.

change for a large payment of cash and stock, that such a statement referred only to the mechanics of drafting a memorial advantageous to both parties, and were no more than what Willits characterized in his March 4 letter as "numerous minor details."

## (2)

### INVESTMENT LETTERS

Defendant claims that it was a principal unresolved issue at the March 19 meeting whether plaintiffs would be required to give defendant investment letters covering the stock they were to receive in the settlement. The Wolf 69 agreement had looked toward the eventual distribution of Wolf stock to the limited partners, and required them to furnish investment letters reciting that they were acquiring their stock for investment purposes only and had no present intention to sell in the foreseeable future. In his March 4 letter, Willits had proposed that the plaintiffs furnish investment letters and, defendant contends, never wavered from this position. Plaintiffs objected to the letters and now deny that this dispute remained unresolved.

The Court believes that the parties had come to an agreement that the letters should not be required. Plaintiffs' counteroffer of March 10, contained in Hall's letter to Willits, provided only for registration rights and dropped any mention of investment letters. Willits' reply on March 14 also failed to mention them. Several witnesses testified that they were not discussed at the March 19 meeting. Giovanelli said in his deposition that he knew that plaintiffs did not want lettered stock. Under the acrimonious circumstances of the lawsuit, it is probable that both sides knew that plaintiffs intended to get rid of any stock received in settlement and that letters, consequently, would be sham. In the opinion of the Court, the most significant evidence of agreement on this issue was the omission of any reference to investment letters in the Carlsen draft. The Court cannot agree that this omission was mere inadvertence. In comparing Paragraph 3 of the Carlsen draft [14] and Paragraph 15B of the Wolf 69 agreement [15] it is obvious that the former was adapted from the latter. It is also obvious that the drafter of the former had in front of him Paragraph 15A of the Wolf 69 agreement; consequently, defendant's attorneys' disregard of Paragraph 15A was most likely intentional. Furthermore, Giovanelli testified that the Carlsen draft (without the investment letter requirement) was acceptable to defendant. Defendant's supposed insistence on these letters did not surface again until later, at which time it represented either a change of mind about the contract or an effort to alter the agreement previously reached. It is not, however, evidence of an earlier unresolved dispute.

Nor is it certain that the furnishing of investment letters was to defendant a *sine qua non* even at the later date when it arose. Defendant had a legitimate interest, of course, in transferring the stock to plaintiffs legally. Investment letters were apparently one means by which the stock could be transferred without a registration statement. Counsel for both sides, however, agreed that there were other means. For example, Willits indicated in his April 9 letter to Halpern that in the absence of investment letters plaintiffs could represent that they would not sell the stock that they received except pursuant to a registration statement. So far from being a matter in dispute, plaintiffs' counsel Rives apparently also contemplated an agreement to that effect by plaintiffs, and it was the recognition of a need for registration in part which was behind the inclusion in the agreement of terms guaranteeing plaintiffs' registration rights. In summary, although this was seemingly what the parties had in mind principally when they referred to securi-

14. Appendix A.

15. Appendix B.

ties matters to be worked out by the lawyers,[16] it does not appear to have been a point of material disagreement.

### (3)

### ANTI-DILUTION PROVISIONS

Plaintiffs, particularly Pyle, insisted at the March 19 meeting on protecting the value of the stock they were to receive against any decline in value which would result if defendant issued additional stock for less than a fair consideration. Defendant did not object to this somewhat commonplace term, and it was agreed that the specific language would be left to the attorneys to draft. Carlsen drafted an anti-dilution clause when he wrote his version of the agreement on March 22. However, he left it out of the agreement and sent his draft language to Willits on the same day to make certain it was acceptable to him. There was no evidence that defendant objected to this term.

During the March 19 meeting, however, the plaintiff Hill sought a guarantee of a different kind. He was concerned that when the stock was registered and offered for sale, the possible competition from other sellers of theretofore unregistered Wolf stock might prevent plaintiffs from selling all their holdings at a satisfactory price. Consequently, he wanted a guarantee that in such an event the shares which were sold and the proceeds from them would be assigned prorata to the various sellers.

There is no evidence that defendant's representatives objected to Hill's demand for this term. It does not appear from the context of the discussions that it was an issue about which defendant was much concerned. The Court concludes, therefore, that Willits acquiesced in Hill's demand and that this term was incorporated in the oral contract of March 19. Carlsen's failure to include it in his draft apparently was a mere oversight. Rives included it in his redraft in response to Carlsen's draft, and Willits did not seem to consider it a disputed point in his letter to Halpern of April 9. Defendant has not represented to the Court that it ever had any substantial objection to this provision (or to Stoddard Pyle's desired term) but only claims that the specific form and language of these terms were not resolved on March 19. As far as the parties were concerned, this was a secondary term and not a prerequisite to the formation of the contract.

### (4)

### HOLD HARMLESS PROVISION

■ The evidence was slight on whether defendant should hold plaintiffs harmless for any claims by third parties arising out of the settlement. There was some uncertain testimony that plaintiffs should be held harmless for any statements which should appear in the future in a prospectus relating to the sale of stock. There was no such provision, however, in the Carlsen draft, and it did not surface again until the Rives redraft.

The Court concludes, without being certain of it, that this term, if discussed, was only discussed peripherally at most on March 19 and was not an element of the agreed contract.

### (5)

### ACCELERATION CLAUSE

■ Although there is some doubt, the preponderance of the evidence shows that there was no discussion on March 19 of incorporating acceleration clauses in the contemplated promissory notes. Most likely the parties did not go beyond agreeing that promissory notes of the ordinary kind and with the usual language would be executed. The Court does not believe that such an agreement as was reached was insufficient for vagueness and concludes that an agreement to execute promissory notes of a usual type is sufficiently specific. In the later negotiations about this clause, defendant did not seem to be concerned whether or not

---

16. It was never made clear what the "tax matters" were which were mentioned at the same time.

this term was included in the promissory notes.

## (6)

### OTHER PROVISIONS

■ Defendant argues that the issues of whether to refer to plaintiffs as "limited partners" in the written agreement, of providing for mutual releases of claims, and of designating an escrow agent to hold the 30,000 shares of stock were material areas of disagreement on March 19 preventing the formation of a contract. However, defendant's argument rests on little or no evidence, and these issues actually amounted to no more than minor details about which there was no real disagreement and which arose only after March 19 as technical problems of draftsmanship.

■ It is undisputed that there was agreement on March 19 that defendant would pay plaintiffs $700,000. Furthermore, the payment would be made in installments. Defendant would execute promissory notes to incorporate that obligation. Defendant stressed that all parties knew it would take time to raise the cash and that since there was no agreement on when the money would have to be paid, there could have been no contract for that reason. However, in the opinion of the Court, what the evidence shows on this point is that the parties agreed that the first installment of $200,000 would be due 90 days from March 19 and that the two additional payments of $200,000 and the one additional payment of $100,000 would be due 60, 120 and 180 days, respectively, after the first installment. Even if the time of payment had been left uncertain,

it is reasonably settled that when parties agree on the payment of money but do not specify the period of time within which it is to be paid, the law will imply that it is within a reasonable time.

■ With respect to other issues which were discussed by the attorneys for both sides at later dates but which were not raised at the March 19 meeting; they are irrelevant for the purpose of deciding whether there was a contract because they either represented efforts to renegotiate additional terms into the contract or else were attempts inspired by lawyer-like caution to draft a memorial covering all contingencies.

Accordingly, the Court finds that these parties carefully agreed on all issues without which there could not have been a contract. Since there was a meeting of minds, then, and since the Court has found that the parties intended to be bound, it follows that the parties entered into an oral contract on March 19.

## III

### STATUTE OF FRAUDS

Defendant next argues that even if an oral contract was concluded on March 19, the contract is unenforceable because it violates the Statute of Frauds as variously set forth in O.R.S. §§ 41.580, 71.-2060 and 78.3190.[17] Defendant claims that there is no sufficient writing which affirms the contract and which is signed by its authorized agent.[18] To overcome this defense, plaintiff relies principally on the Carlsen draft of March 22 and secondarily on the Willits letter to Halpern of April 9, accompanied by the Rives redraft.

---

17. Both parties assume without argument, and the Court similarly assumes for purposes of this decision, that this agreement which was made in Oregon to settle a lawsuit involving a federal claim and litigated in a federal court, and altering contractual relations allegedly deriving from a partnership agreement based upon Colorado law, is governed by Oregon law. *Cf.* Mainline Theatres, Inc. v. Paramount Film Distributing Corp., 298 F.2d 801, 802 n.

1 (3d Cir.) cert. denied, 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962); Theatre Time Clock Co. v. Motion Picture Advertising Corp., *supra.*

18. It is not certain that a writing is required at all. See, e. g., Green v. John H. Lewis & Co., 436 F.2d 389 (3d Cir. 1971), and cases cited therein; Western Bank v. Morrill, 245 Or. 47, 420 P.2d 119 (1966).

■ Defendant's reliance on O. R.S. § 41.580 is without merit. The supposed applicability of this section is based on plaintiffs' interest in the Wolf 69 limited partnership which in turn had interests in various oil and gas rights. But assuming that these latter interests constituted real property within the terms of the statute, plaintiffs' alleged ownership of a limited partnership interest [19] is not itself real property under the Uniform Limited Partnership Act in effect in both Oregon and Colorado. The interest of a limited partner is defined as personal property. O.R.S. § 69.290, C.R.S.1963, § 104–2–18. Accordingly, it is only the Statute of Frauds of the Uniform Commercial Code (enacted in both Oregon and Colorado) which applies. O.R.S. § 71.2060,[20] concerning the sale of personal property not elsewhere covered, is the principal governing provision; O.R.S. § 78.3190,[21] concerning the sale of securities, may also apply. These two sections are sufficiently similar, however, that only the former need be discussed.

71.2060 Statute of frauds for kinds of personal property not otherwise covered.

(1) Except in the cases described in subsection (2) of this section a contract for the sale of personal property is not enforceable by way of action or defense beyond $5,000 in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

(2) Subsection (1) of this section does not apply to contracts for the sale of goods nor of securities nor to security agreements.

The statute thus requires *some* writing which meets three requirements: (1) it must indicate that a contract of sale has been made between the parties at a defined or stated price; (2) it must reasonably identify the subject matter; and (3) it must have been signed by an authorized agent.[22]

The Court is satisfied that the Carlsen draft contains the essential terms of the agreement negotiated three days previously. This document more than adequately spells out the consideration for the contract, and thus satisfies the requirement of a defined or stated price. It, together with Carlsen's cover letter, represents itself to be based on what was agreed at the settlement conference, and thus indicates that a contract was made, particularly in light of other competent evidence. See, generally, 2 A. Corbin, Contracts, § 507 (1963).

The second requirement of the statute is easily satisfied. The writing more than reasonably identifies the subject matter, for it is a formal document of considerable detail.

■ The third requirement presents perhaps the most difficult issue, i. e., whether this document was signed by an authorized agent. As a preliminary matter, it should be noted that defendant's argument that the Carlsen draft was not signed is insubstantial. The covering letter to the copy of the draft which was sent to plaintiffs' attorney was indeed signed by Carlsen. It is generally held that under these circumstances where a signed writing is attached to an unsigned writing, the signature on the one is adequate for the other. 2 A. Corbin, *supra,* §§ 512 and 513. The purpose of the signing is to authenticate the document. See O.R.S. § 71.2010(39), U.C.C. § 1–201(39) and official comment thereto. There is no doubt of its authenticity here.

---

19. As previously noted, plaintiffs say they were limited partners, while defendant says they were not. If defendant is correct, plaintiffs' interest in real property is even more remote.

20. U.C.C. § 1–206.

21. U.C.C. § 8–319.

22. Since defendant is a corporation, all of its actions, of course, can only be performed by agents.

Carlsen has testified, however, and it does not seem to be seriously disputed [23] that he had no authority to negotiate a settlement on behalf of defendant. The negotiations in fact took place for the most part between Willits and the plaintiffs Pyle and Hill. Consequently, there is some doubt whether the signing was the act of an authorized agent.

While Carlsen may not have had authority to settle the case on behalf of defendant, he did have authority to draw up the written version of the contract previously entered into. In fact, this was one of his principal functions. Willits indicated that it was at his request that Carlsen prepared the draft of the settlement agreement. Consequently, he was acting within the scope of his authority when he executed a writing, i. e., when he wrote, signed, and sent his draft to plaintiffs.[24] It is crucial that the Statute of Frauds is satisfied by less than a contract, i. e., by a writing. See 2 A. Corbin, *supra*, § 526 at 782. The purpose of the statute is met by finding this writing sufficient, for there can be no question of fraud or perjury here, nor even a genuine doubt of the principal terms which were agreed to.

Furthermore, the subsequent acts and admissions of defendant's agents who were authorized to settle the case amounted to approval or ratification of Carlsen's act. Willits received a copy of the Carlsen draft when Rives did and made no objection so far as the record discloses. Giovanelli, in particular, testified that the Carlsen draft was satisfactory to defendant.

Accordingly, the Court holds that the Carlsen draft met the requirement of a signed writing by an authorized agent, and consequently that the Statute of Frauds was fully satisfied. The Court does not, therefore, consider the suffi-

ciency of the second set of documents relied on by plaintiffs, Willits' letter of April 9 accompanied by the Rives redraft.

## IV

## USURY

Defendants argue finally that since the contract contemplated the payment of interest at 12% it is usurious and in violation of Oregon law, O.R.S. §§ 82.010(3) and 82.120(5). The Court is not entirely certain that the defense of usury is available in a lawsuit tried after the enactment of O.R.S. § 82.125. In any event, the defense of usury is unavailable for a variety of reasons, including a lack of the requisite "corrupt intent." Washington Nat. Building, Loan & Investment Ass'n v. Stanley, 38 Or. 319, 63 P. 489 (1901).

## V

## RELIEF

In order for damages to be awarded, the Court would have to reckon the difference between what was promised to plaintiffs and what they promised to give up. The former is $700,000 plus 130,000 shares of unregistered Wolf stock. The latter is their interest in Wolf 69 plus their original cause of action against Wolf. All of these items, except for the cash, pose valuation problems which range from difficult to excessively speculative.

A further disadvantage of awarding damages for breaches of this executory contract of compromise is that it would leave the contract unexecuted. That is, it would leave plaintiffs still in possession of their interest in Wolf 69 and free to pursue their original lawsuit. Such an outcome would be totally unreasonable in light of the policy reasons for

23. See plaintiffs' response to defendant's post-trial brief and memorandum, p. 7.

24. Carlsen did not include an anti-dilution clause because this term had been discussed only generally. He wished to make sure his draft language was satisfactory to his client and he, therefore,

wrote Willits separately. See Part II B(3), *supra*. It is significant that from his recollection of the March 19 meeting and his understanding with his client he felt he could send his draft of the rest of the agreement to plaintiffs without first clearing it with his client.

enforcing compromise settlements, i. e., to put an end to controversies. As far as the Court can determine, in all cases where valid compromises have been determined to exist they have been specifically enforced. See, e. g., Cummins Diesel Michigan, Inc. v. The Falcon, 305 F.2d 721 (7th Cir. 1962). Accordingly, the Court concludes that this contract should be enforced according to its terms. It rejects plaintiffs' demand for a combination of damages and specific enforcement, i. e., for cash damages in lieu of Wolf stock.

The Court will defer entering a more detailed order in accordance with this opinion until the parties have had an opportunity to attempt to agree on a form of order. The parties shall have 15 days which may be extended by a joint request. If there is then no agreement, the Court will enter an order for defendant to perform the contract, conditioned on performance by plaintiffs.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## APPENDIX A
### KING, MILLER, ANDERSON, NASH & YERKE
Attorneys and Counselors at Law
900 S.W. Fifth Avenue
Portland, Oregon 97204

March 21, 1971

Mr. Bruce M. Hall
Rives, Bonyhadi, Hall & Epstein
Attorneys at Law
Public Service Building
Portland, Oregon 97204
Dear Bruce:

Since I was the only one who did not take notes at our settlement conference, it seems only right that I should prepare the documents. Here is a starter. The stipulation for dismissal will be in the usual form.

Very truly yours,
(s) Cliff

Enclosure

THIS AGREEMENT made this _____ day of _____, 1971, between The Wolf Corporation, hereinafter referred to as "Wolf" and Stoddard Pyle, Robert Hill, Robert Staley and Arthur Lewis, hereinafter referred to as "Limited Partners."

### WITNESSETH

WHEREAS Wolf, Limited Partners and others formed a limited partnership designated "Wolf-1969," pursuant to the Uniform Limited Partnership Law of Colorado by a Limited Partnership Agreement dated June 1, 1969, and

WHEREAS, the Limited Partners have each filed actions in the Federal District Court for the District of Oregon against Wolf and others claiming damages by reason of alleged misrepresentations and omissions in the sale of such limited partnership interests and failure to register such interests, and

WHEREAS such claims have been denied by Wolf and others, and

WHEREAS Limited Partners desire to sell, and Wolf desires to purchase, their interests in Wolf-1969, and

WHEREAS Limited Partners and Wolf have agreed upon an overall settlement of said claims and all disputes between the parties and the acquisition by Wolf of Limited Partners' interests in Wolf-1969, and

WHEREAS the parties have agreed that Bruce Hall shall act as escrow agent in connection with transfer of stocks described below (hereinafter referred to as "Escrow Agent").

NOW THEREFORE, in consideration of the terms, covenants and conditions hereinafter set forth, it is mutually agreed as follows:

1. On or before 90 days from the date hereof Wolf agrees to:

a. Deliver to Limited Partners certificates representing 100,000 shares of Class A common stock of The Wolf Corporation which have not been registered under the Securities Act of 1933.

b. Deliver to Limited Partners its check for $200,000.

c. Deliver to Limited Partners three promissory notes executed by it

in the form attached hereto as Exhibits A, B and C.

d.  Deliver to Escrow Agent certificates representing 30,000 shares of Class A common stock of The Wolf Corporation which have not been registered under the Securities Act of 1933.

2.  In consideration for delivery by Wolf of the documents described in paragraph 1, Limited Partners agree to:

a.  Relinquish all of their interests in Wolf-1969 and hereby sell and convey said interests and all rights and claims deriving from said interests.

b.  Release and forever discharge Wolf, Joseph Wolf, Samuel Goldberger, Munio Podhorzer, S. J. Wells, Howard Swernoff, Lawrence E. McCombs, Albert N. Ballard, E. M. Arndt, C. Kenneth Grailer, Harry S. Samuels, Samuel I. Samuels, Walter J. Schneider, Paul Akst, Edward Bernsohn, Jac A. Mooney, Lawrence Rose, Emerald Properties, Inc., First General Resources Co., Gordon S. Giovanelli, T. H. Quinn, R. M. Leary, F. A. Stewart, Robert L. Raff, King Resources Company, Louis E. Beckman, Bryon V. Boone, Rowland, Boucher, William V. Coffey, Bennett King, John M. King, Harding L. Lawrence, Timothy G. Lowry, David B. Silberman, James D. Tocher and all others, their successors, heirs, executors, administrators and assigns, of and from any and all actions, claims, demands or damages arising out of, or in any way connected with Wolf-1969 and the sale of interests in Wolf-1969.

c.  Cause stipulations of dismissal in the forms attached hereto as Exhibits D, E, F and G to be executed and filed.

3.  The Limited Partners, shall have the right, until three years after delivery of the stock described in paragraph 1, to require by written notice to Wolf one registration under the Securities Act of 1933, as amended (which shall include qualification under the Blue Sky Laws of such states as the Limited Partners may reasonably request), at the expense of Wolf of any of the Stock to the extent so requested.  In addition to the right to require one such registration at Wolf's expense, in the event that, within three years after such delivery of the Stock to the Limited Partners, it files a registration statement (other than a statement under Form S-8 or its then equivalent relating to an employee's stock option plan) under the Securities Act of 1933, as amended, it shall give the Limited Partners 30 days' prior notice of such filing and, if they request Wolf, in writing, to include any shares of Stock within such registration, then subject to the written consent of the managing underwriter, if any, of the offering, Wolf shall do so, provided the Limited Partners agree to bear their proportionate share of the expenses of such registration and to cooperate in the registration procedure where required.

4.  If, within the 90-day period immediately following the date said Stock is registered as described in the preceding paragraph, the average bid price of the Stock for one week is equal to, or greater than $10 per share, then Escrow Agent shall return 15,000 shares to Wolf.  If, during said period, the average bid price for one week is equal to, or greater than $20 per share, then Escrow Agent shall return 30,000 shares to Wolf.

IN WITNESS WHEREOF, Wolf has caused these presents to be executed by their duly authorized officers and its corporate seal to be affixed hereto and the Limited Partners have hereunto set their hands and seals on the date first hereinabove written.

The Wolf Corporation

By _____

By _____

Limited Partners

_____

Stoddard H. Pyle

_____

Robert Hill

_____

Robert Staley

_____

Arthur Lewis

## EXHIBIT A
## PROMISSORY NOTE

$200,000 ———————, 1971

60 days after date, the undersigned corporation promises to pay to the order of Stoddard H. Pyle, Robert Hill, Robert Staley and Arthur Lewis at Portland, Oregon, $200,000 Dollars. If payment is not made by the due date, then interest shall accrue from this date at the rate of 12 percent per annum. If payment of principal and interest is not made within 30 days of the due date and if this note is placed in the hands of an attorney for collection, the undersigned promises and agrees to pay the reasonable collection costs of the holder hereof; and if suit or action is filed hereon, also promise to pay (1) holder's reasonable attorney's fee to be fixed by the trial court and (2) if any appeal is taken from any decision of the trial court, such further sum as may be fixed by the appellate court, as the holder's reasonable attorney's fees in the appellate court.

The Wolf Corporation

By ————————————

By ————————————

## EXHIBIT B

## PROMISSORY NOTE

$200,000 ———————, 1971

120 days after date, the undersigned corporation promises to pay to the order of Stoddard H. Pyle, Robert Hill, Robert Staley and Arthur Lewis at Portland, Oregon, $200,000 Dollars. If payment is not made by the due date, then interest shall accrue from this date at the rate of 12 percent per annum. If payment of principal and interest is not made within 30 days of the due date and if this note is placed in the hands of an attorney for collection, the undersigned promises and agrees to pay the reasonable collection costs of the holder hereof; and if suit or action is filed hereon, also promise to pay (1) holder's reasonable attorney's fee to be fixed by the trial court and (2) if any appeal is taken from any decision of the trial court, such further sum as may be fixed by the appellate court, as the holder's reasonable attorney's fees in the appellate court.

The Wolf Corporation

By ————————————

By ————————————

## EXHIBIT C

## PROMISSORY NOTE

$100,000 ———————, 1971

180 days after date, the undersigned corporation promises to pay to the order of Stoddard H. Pyle, Robert Hill, Robert Staley and Arthur Lewis at Portland, Oregon, $100,000 Dollars. If payment is not made by the due date, then interest shall accrue from this date at the rate of 12 percent per annum. If payment of principal and interest is not made within 30 days of the due date and if this note is placed in the hands of an attorney for collection, the undersigned promises and agrees to pay the reasonable collection costs of the holder hereof; and if suit or action is filed hereon, also promise to pay (1) holder's reasonable attorney's fee to be fixed by the trial court and (2) if any appeal is taken from any decision of the trial court, such further sum as may be fixed by the appellate court, as the holder's reasonable attorney's fees in the appellate court.

The Wolf Corporation

By ————————————

By ————————————

## APPENDIX B

15. *Registration of Stock.* (a) If any of the Stock shall be distributed to the Limited Partners, each Limited Partner shall execute and deliver to the General Partner an investment letter substantially in the form of Exhibit A attached hereto and the Limited Partner shall not sell, transfer, distribute, hypothecate or otherwise dispose of such Stock except as provided in the investment letter.

(b) The Limited Partners, at any time after the Stock shall be distributed to the Limited Partners, shall have the right, until three years after such distribution, to require by written notice to The Wolf

Corporation given by the holders of not less than 30 percent of the aggregate Stock distributed to the Limited Partners, one registration under the Securities Act of 1933, as amended (which shall include qualification under the Blue Sky laws of such states as the Limited Partners may reasonably request), at the expense of The Wolf Corporation of any of the Stock so distributed to the extent so requested. In addition to the right to require one such registration at The Wolf Corporation's expense, in the event that, within three years after such distribution of the Stock to the Limited Partners, it files a registration statement (other than a statement under Form S-8 or its then equivalent relating to an employee's stock option plan) under the Securities Act of 1933, as amended, it shall give the Limited Partners 30 days' prior notice of such filing and, if they or any of them request The Wolf Corporation, in writing, to include any shares of Stock within such registration, then subject to the written consent of the managing underwriter, if any, of the offering, The Wolf Corporation shall do so, provided the Limited Partners agree to bear their proportionate share of the expenses of such registration and to cooperate in the registration procedure where required.

(c) The Wolf Corporation's obligation under subparagraph 15(b) shall be conditioned as to any such public offering upon a timely receipt by it, in writing, of:

(i) Information as to the terms of such public offering (such as the offering price, the terms of the offer and the underwriter if any) furnished by or on behalf of the Limited Partners; and

(ii) Such other information, documents or instruments as The Wolf Corporation may reasonably require from the Limited Partners for inclusion in such registration statement.

(d) Anything contained in this paragraph to the contrary notwithstanding, The Wolf Corporation shall not be required to file a registration statement on behalf of the Limited Partners if,

in the opinion of The Wolf Corporation's counsel, given in writing to The Wolf Corporation and to the Limited Partners, such registration is not required under the Securities Act of 1933, as amended, in order to effect the public distribution of the Limited Partners' Stock for which registration is requested or if the Limited Partners shall have received from the Securities and Exchange Commission a no-action letter permitting the public distribution desired by the Limited Partners. Nothing herein contained shall be deemed (i) to require the Limited Partners to make application for any such no-action letter or (ii) to condition the Limited Partners' right to registration upon his making any such application.