## DUGAN v. LEAR, Inc.
### No. 218.

Circuit Court of Appeals, Second Circuit.
May 8, 1946.

**30**

Evelyn R. Dugan, in pro. per.

S. Michael Pineles, Drury W. Cooper and Thomas J. Byrne, all of New York City, for appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment, dismissing her complaint for the infringement of Claims one, two, three, four and six of Patent No. 1,959,264, issued to Joseph Dugan, on May 15, 1934, on an application filed March 15, 1930. Judge Rifkind held the claims invalid for lack of invention (Dugan v. Lear Avia, Inc., D.C., 55 F. Supp. 223); and, as we agree, we shall not consider any other questions. Nor shall we describe the invention in detail, or quote the claims; for these we refer to the description upon page 224 of his opinion in 55 F.Supp. The aim of the patent was to provide a mechanism—primarily for aeroplanes—which should enable a pilot to keep a straight line of flight between two points. This was to be accomplished by means of indicators on the plane, which would inform him as soon as he was off his course. The difficulty of holding to a straight line between two points arises from winds blowing at an angle to it, which create a lateral displacement, or "drift" as it is called, that must be corrected by heading at an angle to the line of flight sufficient to counteract the coefficient of displacement. Fundamentally, the situation is the same as when a vessel in a tide is bound for a point on the shore; the pilot must head somewhat up tide and away from his destination, if he wishes to arrive by the shortest route. After an aviator has empirically found the proper angle at which to head his plane to correct the "drift," he need do no more than maintain that angle between the axis and the line of flight, and he will follow the shortest—the straight—line. This for convenience we may speak of as "one point drift correction." However, this is conditional upon the assumption that the laterally displacing factor—the wind—does not change either in direction or velocity during the flight. If it does, although the pilot keeps the axis of his plane always at the same angle to the line of flight, the plane will not reach the terminus ad quem. On the other hand, should the pilot have another point of reference upon the line of flight, no matter on which side of the terminus ad quem that may be, he need not fear any lateral displacement, provided that he can keep himself informed of his bearing to both points. He need then steer only so that both points have the same bearing, for in that case he will necessarily be on the line between them: i. e. the line of flight. He may totally disregard the changing angle between the line of flight and the axis of the plane, which will automatically accommodate itself to any changes in the direction or velocity of the wind. This we may speak of as "two point drift correction"; the claims in suit are all for means to secure it.

All this Dugan disclosed in 1921 in his British patent of that year (No. 161,784); the first twelve figures of which, except Figure Three, relate to "one point drift correction," by means of a compass over the top of which an arrow shows the bearing of the terminus ad quem. All that a pilot need do is to keep the arrow over that point on the compass which marks that bearing. The "complete specifications" (page 6, lines 91–116), explain this clearly. It is true that in this form, there is strictly speaking, no indicator of any other bearing than that of the terminus ad quem, except as that is fixed by the azimuth of the line of flight itself. Nevertheless, that is the equivalent of a point on the surface of the earth in the line of flight projected beyond the terminus ad quem, and serves the same purpose as a second point. Thus Dugan in his British patent had already generically disclosed "drift correction," both "one point" and "two point." All that remained open to him was the means. He found his suggestion in the two Hammond patents— Nos. 1,370,688 and 1,387,850—which may be treated as one. Although the second was the first in application we may take Figure One of the first as the best suited for discussion. It is true that the antenna

loops, 1 and 2, there disclosed do not rotate upon a vertical axis; indeed, that would have defeated the purpose of the disclosure which was to bring the vessel's head to point to the terminus ad quem and hold it there, for Hammond was not concerned with "drift correction." On the other hand "the steering gear, 22," was certainly open for use as an indicator. Suppose, for example, that the device as a whole were placed upon the deck of a vessel: it would always indicate whether the vessel's head pointed to the terminus ad quem. Dugan need not have gone to the Hammond patents for a loop direction finder, for Figure Thirteen of his British patent had already disclosed a radio loop as one kind. That loop, unlike Hammond's, was rotatable, but it was not automatically rotatable, and it did not respond to the differential of energy received by two separate loops, as did Hammond. The pilot had to turn it so as to find the bearing empirically. What Dugan did was to use the Hammond finders, not to change the direction of the plane but to indicate the bearing of two points on the line of flight. The only question in the case is whether the changes necessary for that accommodation will support a patent. Arguendo, we assume that they would, had the art not already disclosed them; but, as will appear, the art had already done so, and, that too, substantially as Dugan disclosed. We need consider only two prior patents.

The first of these is a patent to one Leib: No. 1,850,080, filed July 2, 1926 and issued March 22, 1932. Leib disclosed in Figure One the difficulty encountered by an airplane pilot when he relied upon a compass alone; in Figure Two he disclosed the difficulty when he relied upon what he calls a radio goniometer alone; that is, when he followed a signal transmitted from the terminus ad quem. In Figure Three he disclosed the course when the two are combined: a "two point drift correction." His means of automatically securing flight along that line he disclosed in Figure Five. The text (p. 2, lines 60-99), describes a "loop antenna" so designed that when the signals received from a transmitting station are at their minimum the indicator points to the terminus ad quem; and that when the signals change from the minimum, a "fol-

low-up" motor is actuated and rotates the loop until it again comes to a minimum, at which time the motor stops. The indicator and the loop are so connected that the indicator moves whenever the loop does; and all is automatic. It is true that Leib did not disclose a second point upon the line of flight; and that he used a compass in its stead, as in Figure Three of Dugan's British patent. It is also true that Leib's motor is not reversible, and does not, therefore, turn the loop to its proper position by "the shortest angular route." None the less it is a "follow-up motor" within the meaning of the claims. This the plaintiff denies because the figures in the patent in suit do show a reversible motor; and, as we understand it, she insists that this should be implied in the words "follow-up motor." We cannot agree. It is quite true that at times, in order to save a claim, courts will read a limitation into it which appears in the specifications, but we know of no instance in which they have done so where the feature appears only in the figures. Moreover, there is the best of reasons for this, because to do so, would be really to make a new invention. All sorts of possible combinations may be made out of mechanical drawings, but they require independent ingenuity; no inventor may claim them as his own if he has nowhere mentioned them either in his claims or his specifications.

The second patent is Robinson's British patent No. 202,733, of 1923, which, though earlier than Leib's was an even more complete anticipation of the form of Dugan's disclosure for an automatically adjustable antenna. The plaintiff challenges its operability, saying that the relay, 40, will be too uncertain in its movements, and Dugan so testified upon the trial. His testimony was contradicted, and although the judge did not specifically dispose of the point, Findings 16 and 17 are consistent only with the implication that the disclosure was operative; and those findings are not "clearly erroneous." Robinson avoided the difficulty, which is practically very serious— if it does not indeed amount to impossibility—of designing separate amplifiers, so nicely balanced that they will amplify transmission signals to precisely the same extent. This he did by making use of a

single amplifier which should alternately receive the impulses from either loop, making his relay, 40, correspond to the differential of one series of signals over the other. Such a single amplifier has since become standard in the art. It is true that Robinson did not specify an indicator, as did Leib, but it is plain that he presupposed one. Thus in his specifications he said (p. 3, lines 81-85) that the invention "related to directional wireless systems and apparatus and more particularly to systems of the type in which the bearing of a transmitting station is found." No "bearing" can be "found" unless the pilot has some indication of when the transmitted signals are coming with equal energy to the two loops.

We are therefore presented with the situation—so common in patent litigation—where, although the patented combination is actually new, the art hedged it about very narrowly when it appeared. Dugan may be credited with having used an automatically adjustable loop antenna for one direction finder in place of a compass; for he disclosed two, with an ingeniously contrived mechanical train which mounted the two indicators upon a single axis, so that any divergence should be immediately apparent to the pilot. The specific train which he disclosed cannot by implication be deemed incorporated into the claims; and indeed it would not serve, if it could, for the defendant's devices would not then infringe. Had this substitution of a second antenna for a compass gone into immediate use, displacing all else, it might be possible to say that it would support the patent; but the record does not contain the necessary evidence. It is true that in 1941 the Bendix Company paid a flat sum of $5,000 for a license, and that the Sperry Company paid $10,000, together with a royalty of $60 for all "Plural Receivers." Upon the trial in the spring of 1943 Dugan swore that each licensee had manufactured under the license; but he did not say that he had received any royalties from the Sperry Company. This was surely a significant omission, if substantial royalties had in fact been paid. The record does not show how long before April, 1941, when Dugan asserted that the defendant was infringing,

it had been manufacturing under its patents. The application for the earliest of these was filed on July 27, 1939, over five years after the patent in suit had issued, which confirms the defendant's argument that the patent, when it appeared, did not answer any existing need. This seems readily accountable, when we turn to the report at the end of 1935 of a subcommittee on "direction finders" of the "Radio Technical Committee of Aeronautics," which declared—probably with knowledge of Dugan's patent already nearly twenty months old—that there were seven "principal reasons for transport operators not making immediate use of this equipment": i. e. "radio direction-finding equipment." There is much reason therefore to believe that Dugan's disclosure in 1930 was premature; it was "new" but it was not then "useful." That of course does not inevitably preclude its being patentable—an inventor may be in advance of his time—but it much reduces the strength of any inference to be drawn from any later acceptance of the invention. The inducement to design "machines" or "compositions of matter" is exceedingly weak while the art is not independently ready to exploit them; there is no spur to do what when it is done, must lie unused. The absence of such a spur makes it unlikely that the art should have been at work at the problem. There is not an actual; there is only a contingent, or prospective, need. To apply that reasoning here: if the substitution for a compass of a second antenna, though electrically and mechanically operative, did not in 1930, or even six years later result in a direction finder that was practicable, there is not that reason to say that its discovery was the result of exceptional ingenuity which there might have been, had it been immediately available. Such an invention is scarcely more than a variant in vacuo. Evidence of invention is to be found when there has been an immediate demand which has awaited, and has been capable of, satisfaction over a substantial time. This record portrays nothing of that kind. We have so often discussed the factors on which patentable invention depends that we need do no more than refer to our last decision.

Safety Car Heating Co. v. General Electric Co., 2 Cir., 155 F.2d 937. We hold that the claims in suit are invalid for lack of invention.

Judgment affirmed.