Nathan LEVIN

v.

RIPPLE TWIST MILLS, INC.

Civ. A. No. 76–255.

United States District Court,
E. D. Pennsylvania.

May 28, 1976.

Alan H. Bernstein, Philadelphia, Pa., for plaintiff.

Leon Edelson, Walter B. Udell, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Presently before the Court are (a) the plaintiff's motion to disqualify Leon Edelson and Walter B. Udell from acting as counsel for the defendant; (b) the plaintiff's motion to stay arbitration; (c) the defendant's motion to dismiss the complaint or in the alternative to stay proceedings and compel arbitration. We will deny the plaintiff's motions. We will deny the defendant's motion to dismiss the complaint, but we will grant its motion to stay proceedings and compel arbitration.

### BACKGROUND

The plaintiff, Nathan Levin, (Levin) has brought an action charging the defendant Ripple Twist Mills, Inc. (Ripple Twist) with patent infringement, unfair competition and breach of contract. About a decade ago, Levin, an accomplished inventor, proposed to Mr. Milton Newman that Levin develop and construct a circular knitting machine for Newman, who would use it in his business of manufacturing tubular elastic netting. Levin and Newman entered into a contract dated December 29, 1967, (Agreement [1]) in which Levin undertook to design, develop and construct a circular knitting machine within certain time limits. Newman agreed to pay royalties calculated as a percentage of his gross sales of the products manufactured on the new machines.

The Agreement delineated the respective rights of the parties to prosecute patents for the know-how and for the machines developed by Levin. (Under certain conditions, Newman could prosecute patents in Levin's name.) Newman's royalty obligations, however, did not depend on the patentability of Levin's inventions; they would accrue even if no machine developed for Newman was patented. On the other hand, the Agreement made Newman a licensee of any patents that might be obtained.

After Newman died in 1974, his wife sold the knitting business to C & K Manufacturing and Sales Company in Ohio. C & K assumed all rights and obligations under the 1967 agreement. Thereafter C & K transferred (or purported to transfer) the knitting business to Ripple Twist and assigned to Ripple Twist its rights and duties under the Agreement. Levin alleges that Ripple Twist is a subsidiary of C & K which was created for the purpose of circumvent-

1. Complaint, Exhibit A.

ing the licensee's royalty obligations under the agreement. He claims that Ripple Twist sells its netting to C & K at an artificially low price, and bases its royalty payments on that price.

Levin contends that he has terminated the Agreement. Either party may terminate the Agreement in the event of the other's material breach (Paragraph 23). Additionally, Levin may end the contract on thirty days notice for non-payment of royalties, unless the royalties are paid during the notice period (Paragraph 11). Levin claims to have exercised his rights under both paragraphs. The defendant maintains that it has paid royalties in full and has not breached the agreement. It says the royalty dispute must be submitted to arbitration, pursuant to the arbitration clause in the Agreement (Paragraph 23).

In order to emphasize its assertion that this is essentially a contract case, not a patent case, the defendant has admitted for the record: a) that the Levin patent named in count I of the complaint (the infringement cause of action) is a valid patent, and b) that the machines used by Ripple Twist to manufacture all of the tubular netting it now sells are covered by that patent. (Defendants brief, p. 9) If the contract is still in effect then the defendant is a licensee under the Levin patent and cannot be liable for infringement. On the other hand, if Levin effectively terminated the agreement then the conclusion that Ripple Twist is

liable for infringement follows as a matter of course.[2]

Unfortunately, the restless minds of inventors have upset the lawyers' effort to simplify the issues in this case. The plaintiff now tells us that Ripple Twist is developing and testing a new knitting head for manufacturing of tubular elastic netting.[3] Ripple Twist's position is that its new device is neither covered by the Levin patent claim nor by the terms of the Agreement. Thus, if it is decided that the Agreement is still in force it will be necessary to decide whether the new knitting head is covered by the Agreement and this decision may or may not require a ruling about the scope of the Levin patent claim. If, on the other hand, the Agreement is terminated and Ripple Twist is no longer a licensee, the question whether the new knitting head infringes the Levin patent will become ripe for adjudication.[4]

## STAY PENDING ARBITRATION

▆ A patentee cannot assert an infringement claim against his licensee with respect to the patent licensed under a subsisting agreement. *Components, Inc. v. Western Electric Company,* 318 F.Supp. 959 (D.Me.1970). The Agreement between Levin and Newman (the defendant's predecessor) provided for the granting of a license for the use of the plaintiff's "machine for producing tubular elastic netting," an invention which later became protected by Patent No. 3,592,024.[5] If the Agreement is

---

**2.** If the court or arbitrator deemed the termination to be effective on the date of its decision, then the defendant could avoid liability for infringement by ceasing to use the patented inventions.

**3.** This fact was not specifically alleged in the complaint.

**4.** The defendant's admission of patent validity is unqualified and therefore applicable to disputes arising about the new machine. The admission about the scope of the patent, however, only refers to machines currently in production use by the defendant. Up to this time the plaintiff has not disputed the defendant's representation that the new knitting head is not yet being used to produce netting for sale.

**5.** Paragraph five of the agreement states, in part:

"All patent rights in and to such ideas, discoveries, improvements or inventions conceived and developed by LEVIN shall be the property of LEVIN as the sole and exclusive owner thereof, subject, however, to NEWMAN having an exclusive license thereunder pursuant to the provisions of this agreement."

Paragraph seven provides, in part:

"LEVIN hereby grants to NEWMAN the sole and exclusive right and license to manufacture, sell and use throughout the world circular knitting machines embodying the aforesaid improvements and inventions of LEVIN and to manufacture and sell throughout the world circular knit tubular elastic netting produced upon said machines as well as cir-

still in force it is a total and complete defense to counts I and II of the complaint, so far as the "Old" machines are concerned.[6] The plaintiff, however, claims to have terminated the Agreement pursuant to paragraphs eleven and fifteen, on the ground that full royalties have not been paid.[7]

■ If it is found that Ripple Twist has paid royalties in full, the conclusion is likely to follow that the contract was not breached, and is still in force. An adjudication of the royalty dispute requires an interpretation of the agreement and an inquiry into the defendant's business practices. This is the kind of decision-making which the parties agreed to refer to an arbitral rather than to a judicial forum. Paragraph 23 of the Agreement states, in part:

> "Any dispute, claim, question or difference arising out of or relating to this agreement which cannot be resolved by the parties hereto shall be submitted for arbitration at Philadelphia, Pennsylvania, upon the initiative of either party upon notice of the other party pursuant to the Arbitration Rules then obtaining of the American Arbitration Association, and the parties hereto agree to abide by and perform in accordance with any decision rendered by submission of any controversy to arbitration."

We are satisfied that the issues of computation of royalties and of termination of the Agreement are referable to arbitration under this clause. Consequently, 9 U.S.C. § 3 requires that the trial of this action be stayed.

■ The plaintiff says the stay will severely prejudice him because in arbitration he may not be able to subpoena evidence from C & K Industries, in Ohio, or to take substantial discovery from Ripple Twist. Without access to this evidence, plaintiff may not have an opportunity to prove its contentions that Ripple Twist is a subsidiary of C & K, and that the two companies are defrauding the plaintiff by setting artificially low "sale" prices which they use to compute their royalty obligation. In a proceeding to compel arbitration, no discovery into the underlying grievance is ordinarily permitted, *Econo-Car International, Inc. v. Antilles Car Rentals, Inc.*, 61 F.R.D. 8 (D.V.I.1973), *but see International Union of Electrical, Radio and Machine Workers v. Westinghouse Electric Corp.*, 48 F.R.D. 298 (S.D.N.Y.1969) (discovery allowed limited to issue of arbitrability). In extraordinary circumstances, granting of discovery during a stay is within the court's discretion, *Bigge Crane and Rigging Co. v. Docutel Corp.*, 371 F.Supp. 240 (E.D.N.Y. 1973). In the instant case, the plaintiff's unanswered discovery goes to the subject matter of the dispute. Whatever hardship may be caused to the plaintiff if he obtains less discovery in arbitration than would be available in this court, he accepted the risk of being placed in that position when he accepted the arbitration clause in the Agreement. There are no extraordinary

---

cular knit tubular elastic netting constructed in accordance with and embodying any patentable improvement and inventions of LEVIN, together with the sole and exclusive right by NEWMAN to grant sublicenses . . ."

6. As mentioned above, the plaintiffs have, in their briefing, advanced an infringement claim against a new knitting head.

7. Paragraph eleven states in part:
"It understood and agreed that if the quarterly royalties payable to LEVIN as herein before provided are not transmitted by NEWMAN on or before the 30th day of the month following the expiration of each quarterly period herein before mentioned, LEVIN may notify NEWMAN in writing of his intention to terminate this agreement, whereupon, unless NEWMAN within thirty (30) days after receiving such notice shall pay to LEVIN the royalties due for sales made by NEWMAN during the preceding quarterly period, this agreement shall thereupon terminate without, however, prejudice to the right of either party to sue for any antecedent breach."
Paragraph fifteen begins:
"This agreement may be terminated by either party as to the rights of the other for a material breach by the other party without thereby affecting the rights hereunder of the party not in default."

circumstances here justifying a discovery order during a stay.[8]

The new machine issue does not make a stay to allow arbitration any less appropriate. If the Agreement is in force, Ripple Twist is licensed to use inventions covered by Patent No. 3,592,024, and Levin cannot state a cause of action for infringement with regard to either the old or the new machine. Levin argues, however, that even if it is assumed that the Agreement is in force, the new machine issue cannot be referred to arbitration. He says that to decide whether the new knitting head is covered by the contract, the arbitrator would have to adjudicate the scope of the Levin patent. But, he says, a court may not defer a question of infringement to an arbitration. There are two problems with this argument. First, it is far from clear that the arbitrator will even have to consider the new machine issue. Levin has not controverted, with evidence or allegation, the defendant's assertion that the new knitting head is not in production use. With the head still being developed, and there being no royalty dispute in regard to it, the arbitrator may find the issue not ripe for decision.[9] Second, the arbitrator could decide the new machine issue without trying to adjudicate the infringement question. Under the Agreement, Ripple Twist must pay royalties on all sales of

> "circular knit tubular elastic netting (whether patentable or not) produced upon circular knitting machines constructed in accordance with and *embodying any improvements or inventions of Levin.*" (Paragraph 9) (emphasis supplied)

It would not be necessary for the arbitrator to determine that the new machine was covered by a Levin patent to find that the contemplated use of the new knitting head in production would involve the use of machines embodying Levin inventions.[10]

We conclude that the Agreement calls for arbitrating the kind of disputes presently before the court. Submitting this controversy to arbitration will not contravene the patent laws, or any other law or policy. Pursuant to 9 U.S.C. § 3, this action must be stayed pending arbitration.

## DISQUALIFICATION OF COUNSEL

An attorney must preserve the confidences of one who has employed him

---

8. We call attention to the defendant's declaration:

   "The defendant is certainly willing to, and states to the Court at this time that it will, make available to the Arbitration Board any and all information requested by that Board. If requested, the defendant will disclose the details of the sales transactions showing changes of ownership of Ripple Twist Mills and any other details of interest to the Board." Defendant's Brief in Support of Motion to Dismiss, p. 16.

   We understand this statement to operate as (a) a waiver of any jurisdictional or procedural grounds for opposing a Board request for discovery, and (b) an estoppel against claiming, in the future, that producing the information referred to would be burdensome or prejudicial.

9. At this point in the discussion the assumption is that the arbitrator has found the Agreement to be in force. Under that assumption if the arbitrator failed to decide the new machine issue there still would be no federal question in the case. The defendant, as licensee, could not be sued for infringement.

   If we assume, for a moment, that the arbitrator found the Agreement to be terminated, the plaintiff's patent claim with regard to the new machine might nonetheless have to be dismissed. The manufacture and experimental use of a machine which is covered by a patent is not an infringement unless and until the machine is put to a commercially valuable use. *Kaz Manufacturing Company v. Cheseborough-Ponds, Inc.,* 317 F.2d 679 (2d Cir. 1963), *but see Dugan v. Lear, Inc.,* 55 F.Supp. 223, aff'd. 156 F.2d 29 (2d Cir. 1946). Unfortunately there are few opinions which decide when commercially valuable use begins. *See e. g. Spray Refrigeration Co. v. Sea Spray Fishing Co.,* 332 F.2d 34, 36 (9th Cir. 1963), (patented method for freezing fish used experimentally, but as part of the production process yielding a product that was actually sold.)

10. The instant case is distinguishable from *Diematic Manufacturing Co. v. Packaging Industries, Inc.,* 381 F.Supp. 1057 (S.D.N.Y.1974), because there the defendant promised not to infringe plaintiff's patent.

    "[T]he determination of whether [defendant] has breached the agreement will necessarily depend upon whether an infringement has occurred." 381 F.Supp. at 1061.

and this obligation continues after the termination of employment.[11] In order to disqualify his former attorney from representing an adverse interest in later litigation, a party must show that the issues in the current suit are substantially related to the subject matter of the attorney's previous representation of the party. If this substantial relationship test is satisfied, the court will disqualify the attorney. It will not inquire into whether or not there has been an actual violation of confidences. The Third Circuit summarized this rule in *American Roller Company v. Budinger*, 513 F.2d 982 (3rd Cir. 1975), as follows:

> "Courts have enforced these precepts by requiring disqualification of counsel where it appears that the subject matter of a pending suit in which the attorney represents an interest adverse to a prior employer is such that during the course of the former representation the attorney 'might have acquired substantially related material.' *Richardson v. Hamilton Int'l Corp., supra*, 469 F.2d [1382] at 1385; *T. C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265 (S.D.N.Y. 1953)." 513 F.2d at 984.[12]

In its recent opinion in *Kramer v. Scientific Control Corp.*, 534 F.2d 1085 (1976), the Third Circuit reaffirmed the rule of *Richardson, supra*, and *American Roller Co., supra*. Quoting *Richardson*, the court states that a court may disqualify an attorney for failing to avoid the appearance of impropriety, 534 F.2d at 1089. "Appearance of impropriety" is a general principle governing disqualification. The nature of each case determines what test to apply in deciding whether there is such an appearance.

In *Kramer*, an attorney who was the representative plaintiff in a class action "retained" his law partner as class counsel. The court held that an attorney who brings a class action as plaintiff cannot chose a class counsel who is professionally associated with him. The appearance of a conflict of interest is created if the class action has a potential for creating a monetary fund from which counsel fees will be drawn. When attorney fees are assessed, the class counsel's interest may become adverse to the interests of plaintiff class members. The representative plaintiff should not be a person who would be expected to benefit in some way from the fees paid to his associate.

The court noted that "a class action is a special type of legal proceeding." 534 F.2d at 1091. One of its special features is, of course, that a great number of the plaintiff-clients do not know about, or do not participate in "their" attorney's litigation of the action. Especially stringent safeguards are needed to prevent the appearance of impropriety in that situation. The plaintiff is misguided in his attempt to present *Kramer* as establishing an "appearance" test wholly separate from the substantial relationship test. The *Richardson-American Roller* substantial relationship test is still applicable to conventional lawyer-client relationships in the situation where a former client challenges his former attorney's right to represent an adverse party in litigation.

Three questions control our disposition of the motion to disqualify counsel:

What subject matter is implicated in the instant suit?

---

11. Code of Professional Responsibility, Canon 4. "Canon 9 is case law in this court . . ." *Kramer v. Scientific Control Corp.*, 534 F.2d 1085 at 1089 (3d Cir. 1976).

12. The Second Circuit has held that a stricter test then substantial relationship must be applied when the challenged attorney is contemporaneously representing the moving party. *Cinema V, Ltd. v. Cinemarama Inc.*, 528 F.2d 1384 (Opinion filed January 27, 1976), 1976-1 trade cases ¶ 60,698. When the instant motion was filed the Edelson/Udell office was performing some services for the plaintiff in connection with foreign patent matters. However, Edelson and Udell have since terminated that relationship and the *Cinema V* rule is not applicable to this case. (Udell Affidavit, Exhibit 4) In *Cinema V* the challenged firm offered to withdraw the representation that created the apparent conflict interest and division of loyalties but the offer was refused. The court's opinion implies that if the offer had been accepted, the court would have reverted to the substantial relationship test in deciding the motion.

What subject matter was implicated in the prior representations of plaintiff by Edelson/Udell?

What significance should be given to the peculiarities of the "attorney-client" relationship between Levin and Edelson/Udell during the prosecution of the Levin patent?

The first question has been answered earlier in this opinion. The defendant's admissions have entirely eliminated patent validity as an issue in this case, and have eliminated any dispute about whether defendant's old machines are covered by the patent. There is a live controversy about whether the new knitting head is covered by the Levin patent. That issue will not be adjudicated in this court, however, if the arbitrator finds that the Agreement is in force and that defendant's machines, equipped with the new knitting head, embody Levin inventions. Finally, there are contract issues in this suit revolving around the defendant's alleged breach of the Agreement. These claims will be decided in the first instance by arbitration.

To answer our second question—about the subject matter of prior representations—we must resolve conflicting contentions of fact. The plaintiff has put forward two claims that deserve examination: (a) that Levin, prior to filing the instant complaint, consulted with Edelson/Udell about the merits of the suit; and (b) that Edelson/Udell acted as his patent counsel in prosecuting the patent in suit.

■■■ Attorney-client privilege may attach to confidences shared with an attorney during a discussion of the possibility of representation, whether or not the counsel is in fact retained. Levin says that he sought legal advice from Edelson/Udell about his controversy with Ripple Twist. He claims that only after discussing his thoughts about the dispute at some length did Edelson/Udell tell him that they would not represent him against Ripple Twist. These allegations clearly satisfy the substantial relationship test. They are contested, however. Edelson/Udell say that they

promptly rejected Levin's request that they represent him against Ripple Twist and that no confidences were shared with them prior to the rejection. Hence, we have to resolve a credibility issue. The evidentiary record includes two affidavits each, filed by Levin, Edelson, and Udell, together with supporting exhibits. Levin has filed three briefs pertaining to this motion, and Ripple Twist has filed two. Levin, Edelson, and Udell attended an argument on the motion, held in chambers on April 9, 1976. Edelson and Udell participated directly, and Levin participated through counsel.[13] Neither party has requested an evidentiary hearing, and we do not believe one is necessary with regard to this motion.

■■■ We credit Edelson's description of the pertinent communication between him and Levin, and we disbelieve Levin's testimony on this point. Hence, we find that the relationship between Edelson/Udell and Levin never advanced to a point which would be deemed "representation" for the purposes of a motion to disqualify counsel. The basis for our finding is as follows.

Edelson has represented Milton Newman and members of his family since 1927. Also, Edelson has been friendly with Mr. Levin since the late 1930's. Mr. Newman was not a lawyer; Mr. Levin, on the other hand, is a registered patent attorney who has prepared and prosecuted numerous patent applications for himself and others, and has negotiated on his own behalf various licenses in which he was a licensor. When the Agreement was negotiated between Levin and Newman in 1967, Levin represented himself and Edelson represented Newman. (Levin described this negotiation in his first affidavit in language which one could read as saying that Edelson was acting on behalf of both parties. Levin clarified this statement in a second affidavit in which he admitted that Edelson was representing Newman.) We credit Edelson's statement that he made clear to Levin during Newman's lifetime that if a dispute ever were to arise over the Agreement, he would be

---

13. Mr. Levin is an attorney.

bound to represent Newman and Ripple Twist.[14] Newman's death and the sale of his business may have seemed to open the way for Edelson/Udell to represent Levin in tubular netting matters. But we credit the testimony of Edelson and Udell that they did not think about this idea for long and that nothing resembling a confidence was shared with them prior to their rejection of the proposal. Ironically, the clearest reason why Edelson/Udell would have to decline to represent Levin against Ripple Twist was that they would almost certainly have been disqualified from such representation.

In resolving the credibility issue, we have taken into account that Edelson has described in detail and with consistency the history of his representation of Mr. Newman and of his relationship with Mr. Levin. None of his statements have been disproved by extrinsic evidence. Mr. Levin's affidavit on the other hand, is less precise, and he has had to restate a critical passage in his first affidavit, i. e. the section which implied that Mr. Levin considered Mr. Edelson to be acting as his attorney during the negotiation of the Agreement. In his supplemental affidavit Levin says that he, Levin, knew Edelson was representing Newman, but *Edelson* thought he (Edelson) was representing both Newman and Levin. We do not understand how Levin can presume to know better than Edelson who Edelson thought he was representing.[15]

■■■ We will now take up the second claim we referred to—that Edelson/Udell

prosecuted the Levin patent and therefore they cannot represent a client charged with infringing it. Because of the defendant's admissions, this argument must be narrowed to the question of whether Edelson/Udell can represent the defendant against the charge that the new knitting head is within the scope of the Levin patent. (Validity of the patent is admitted.) Edelson and Udell reply that the attorney who prosecuted a patent is in no better position than any other attorney to litigate the issue of the scope of a patent claim. The scope of a patent is determined by the interpretation of the "file wrapper" documents in the Patent Office.[16] The law requires that the documents be read as if by a complete stranger to the patent application. *Borg-Warner Corporation v. Paragon Gear Works, Inc.*, 355 F.2d 400 (1st Cir. 1965), *Ziegler v. Phillip's Petroleum Co.*, 483 F.2d 858, 870 (5th Cir.), *cert. denied* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973). Clearly, knowing the thoughts of the inventor may be of no help to an attorney litigating file wrapper estoppel, while his ideas almost always would be an aid to an attorney dealing with state of prior art issues while litigating patent validity. However, we think the possibility that an inventor's confidence could become useful in file wrapper estoppel litigation is large enough that we must consider a patent prosecution to be substantially related to a file-wrapper defense in a suit for infringing the same patent. In most circumstances an attorney may not represent the alleged infringer

**14.** Newman's business, Ripple Twist Mills, is a different entity than defendant, Ripple Twist.

**15.** Levin has tried to base his allegation on a very slender reed, a copy of a letter by Edelson, jointly addressed to Levin and Newman. The letter accompanied a draft agreement Edelson had drawn up after a meeting of Levin, Newman and Edelson.

**16.** When the patent office initially rejects an application, it states the reasons for the rejection. This enables the applicant to try narrowing its patent claim in order to win approval. There may be a number of patent office actions, and applicant replies, before the applicant abandons the prosecution or the patent office grants the patent. If the patent is grant-

ed, the communication between the office and the applicant which previously were confidential then become public knowledge and they are contained in what is called the file wrapper. A patent gives an inventor a monopoly not only over the exact device described and drawn in the patent but also over devices that perform substantially the same function in substantially the same way, to obtain the same result. This added scope of protection is called the doctrine of equivalence. An exception to this rule is that a patent holder who as an applicant narrowed his claim in response to patent office action, is estopped from claiming protection under the doctrine of equivalence for the abandoned area of the claim.

over the objection of his former client, the patentee.

If, during the prosecution of the Levin patent, there had been a normal attorney-client relationship between Edelson/Udell and Levin, our analysis now would be at an end and we would have to grant the disqualification motion. The facts are otherwise. During the relevant time period, Newman, the defendant's predecessor, always was Edelson/Udell's primary client. Edelson/Udell acted as counsel of record on the patent application only so long as it was in Newman's interests, and it always should have been clear to Levin that to the extent he then was Edelson/Udell's client, he was their secondary client in this matter, and that Levin might at some future time be litigating against their primary client. Under the Agreement, Newman had the right to prosecute patents in Levin's name, and Levin was obligated to cooperate with attorneys of Newman's choosing so long as Newman actively pursued the application.[17] Newman paid the costs of the prosecution, including Edelson/Udell's fees. Levin bargained for this arrangement. It saved him the expense of patent prosecution, but allowed him to participate in the proceedings to the extent he thought it in his interest. We cannot presume that the technical lawyer-client relationship between Levin and Newman's attorneys induced Levin to share any information which he was not contractually obligated to disclose to them in any event. Under these circumstances, we do not think the Levin-Edelson/Udell relationship in connection with the patent prosecution should be considered a "prior representation" within the meaning of the substantial relationship test. Although a party has no absolute right to a *particular* counsel, it would be particularly unfair to deny to Ripple Twist its representation by the firm which represented its predecessor in interest from the very inception of the Agreement.

Paragraph 6 of the Agreement, which has been reprinted in the margin,[18] gave Newman the right to prosecute patent applications in Levin's name on any of the devices, products, or methods developed for him by Levin. Newman filed and began to prosecute several applications but the Patent Office repeatedly rejected them on the ground

17. If the motion were granted, we would have to decide which information in the Edelson/Udell files pertaining to the prosecution of the Levin patent should be transferred to the counsel who replaced them. How would the court decide which statements made by Levin were being made because of his duty to share his ideas with Newman and Newman's attorneys, and which were made because of Levin's reliance on the relationship created by his execution of a power of attorney? It is hard to avoid defining the relationship between Edelson/Udell and Levin under the power of attorney without reference to the total context of the Agreement.

18. Paragraph 6 of the Agreement reads:
"(a) Upon the conditions hereinafter set forth, NEWMAN agrees to bear all of the costs and expenses of filing and prosecuting applications for any and all such United States and foreign patents covering any patentable improvements of LEVIN which NEWMAN may elect to have filed, and to that end NEWMAN may engage an attorney of his selection to prepare, file and prosecute such application or applications. It is expressly understood and agreed that NEWMAN shall have the sole right to elect those applications which he desires to have filed for letters patent covering the LEVIN inventions and to continue the prosecution of applications for and maintain in force such letters patent as he (NEWMAN) may desire. However, before any patent application elected to be filed by NEWMAN is permitted to become abandoned for nonprosecution thereof or before any patent, United States or foreign, granted upon any application elected to be filed by NEWMAN is permitted to lapse for any reason, NEWMAN agrees to seasonably notify LEVIN of his intentions in the matter and so afford LEVIN the opportunity and option of continuing the prosecution of any pending application or of keeping the patent alive as may be desired by and at the expense of LEVIN.
"(b) In the event that NEWMAN elects not to file any application covering any improvement of LEVIN aforesaid within six months after being informed by LEVIN of said improvement or within three months after the first public use or sale of any product embodying any such improvement, LEVIN shall have the right at his own expense to file application for patent, United States and/or foreign, covering the same."

their claims were already covered by an existing patent (referred to as the Mintz patent). During this time, Edelson/Udell were counsel of record on the applications, acting under a power of attorney executed by Levin. On the one hand, this arrangement effectuated Newman's right to have the applications prosecuted by attorneys of his choosing (while he was bearing the costs of the proceedings); on the other hand, it was necessary if the patent was to be issued in Levin's name, as was Levin's right under the Agreement. The evidence shows that Levin, who was a patent attorney himself, generated most of the ideas for the prosecution, and also was primarily responsible for reducing them to writing and arguing them before patent examiners.

In light of the unfavorable responses to the applications, Edelson/Udell re-evaluated the situation for their client, Newman, and advised him that it was no longer in his interest to bear the expense of the prosecutions. (Edelson Affidavit, Exhibit E) Newman accepted this advice. Pursuant to Paragraph 6(b) of the Agreement, Newman notified Levin of his decision. (Edelson Affidavit, Exhibit F) So informed, Levin revoked the power of attorney he had given Edelson/Udell. He took up the prosecution of the application, which eventually matured into Patent No. 3,592,024, the one sued upon.[19] It was after the revocation of the power of attorney that Levin, acting as his own attorney, narrowed his claim to the satisfaction of the Patent Office. The documents reflecting this narrowing process would be the focus of a file wrapper estoppel defense.

We think this history bears out the conclusion that for the purpose of this motion Edelson/Udell's work in connection with Patent No. 3,592,024, should not be considered a prior representation. This holding depends on the very special circumstances of this case. We would be inclined towards another view of the matter if, for example, Edelson/Udell were representing

a total stranger to the Agreement (rather than a successor in interest to Newman).

■ One problem remains. Edelson/Udell filed of record a confidential memorandum written to them by Mr. Levin in connection with another matter. After the filing, Levin moved the court to seal the file in this case and place the documents pertaining to the disqualification motion under seal, and to hold any argument or hearings on the motion in camera. Defendant did not oppose the motion, on the condition that the proceedings be entirely in camera or entirely public, but not a mixture of the two. We will grant the motion.

Disciplinary Rule DR 4–101(C)(4) states in part:

"[A] lawyer may reveal: (4) Confidences or secrets necessary . . . to defend himself . . . or associates against an accusation of wrongful conduct."

A motion for disqualification is not, by itself, an accusation of misconduct. Disqualification is a prophylactic measure. The court does not inquire into whether there have been actual ethical violations, but only whether they might occur. This case has an added element, in that the plaintiff specifically accused Edelson/Udell of accepting his confidences when he sought their representation, and of their turning around and representing his adversary. Nevertheless, it is alarming how broadly Edelson/Udell have read the above-quoted rule. They filed a confidential document on the alleged ground that it tends to show that Mr. Levin has a character propensity for incorrectly perceiving improprieties in the actions of opposing counsel. If the court accepted this first inference, it would then be asked to make the additional inference that Mr. Levin had falsely sworn in his affidavits filed in this case.

■ In almost any case when an attorney and a former client are adversaries in the courtroom, there will be a credibility contest between them. This does not entitle the attorney to rummage through ev-

---

**19.** The official patent drawing bears the signature of Edelson/Udell because Patent Office procedures at that time prohibited any substitution for the names of the attorney who originally filed an application.

ery file he has on that particular client (regardless of its relatedness to the subject matter of the present case) and to publicize any confidential communication he comes across which may tend to impeach his former client. At the very least, the word "necessary" in the disciplinary rule requires that the probative value of the disclosed material be great enough to outweigh the potential damage [20] the disclosure will cause to the client and to the legal profession.[21] The probative value of the material disclosed by Edelson/Udell is extremely small. The disclosure has already caused some damage to the plaintiff. Even so, at argument on the motion Edelson/Udell offered to show the court another confidential communication. It, too, was taken from an unrelated file, and was offered for the purpose of impeaching credibility. The court declined the offer. These tactics make it necessary for us to emphasize that while we are denying the motion for disqualification, we disapprove of the use that has been made, and attempted to be made, of privileged materials taken from files unrelated in subject matter to the instant suit.

---

20. In matters outside the case in suit.

21. The spectacle of the disclosure may cause a lessening of public trust in the bar.