NELSON, Circuit Judge:
This is an appeal from an order of the district court affirming the bankruptcy court’s order determining the amount of appellants’ claim against the bankruptcy estate of Beverly Hills Bancorp (“Bancorp”). Appellants (hereafter “commercial paper *1332 holders" or “CPH”) are a certified class of approximately 225 holders of Bancorp’s commercial paper.
Bancorp owned essentially all of the issued and outstanding shares of Beverly Hills National Bank (“the Bank”). In the early 1970’s, Bancorp made a series of loans that were financed by issuing term notes, or commercial paper. Bancorp sold the commercial paper to appellants, all customers of Beverly Hills National Bank, without registration under the Securities Act of 1933.
In 1973 Bancorp defaulted on the commercial paper. Thereafter a class action was brought on behalf of the CPH, alleging fraud and various Securities Act violations and seeking full recovery from the Bank for the approximately $12,500,000 paid out by the CPH.
In January 1974, the Bank’s assets were sold to Wells Fargo Bank for $12,200,000, thus establishing the Bank Fund. The Bank was placed under a conservatorship, with the Chief Counsel of the Comptroller of the Currency appointed as Conservator. He agreed not to distribute the Bank Fund except pursuant to a court order in the class action.
In April 1974, Bancorp filed a petition for bankruptcy pursuant to Chapter X, former 11 U.S.C. §§ 501 et seq. Appellee R. W. Hine was appointed Trustee in reorganization. Despite the Trustee’s efforts to gain control of the Bank Fund, the $12,200,000 remained in the Conservator’s control, outside the bankruptcy court’s jurisdiction.
In June 1974, the Conservator began a proceeding under the Bank Conservation Act, 12 U.S.C. §§ 201 et seq., to bring the numerous suits against the Bank into one courtroom. The Conservator determined that it was in the Bank’s best interests to settle all of its liabilities and to distribute all of its assets; the total claims against the Bank, however, exceeded the total amount of the Bank Fund. The CPH, First National City Bank (“FNCB”) and Wells Fargo asserted creditor claims against the fund, while the Trustee, standing in the shoes of Bancorp, claimed a shareholder interest.
Following extensive negotiations and numerous drafts, a final version of the Bank Fund Settlement Agreement (“BFSA” or “Settlement Agreement”) was accepted and signed by all the parties in July of 1975. The agreement provided for distribution of the Bank Fund to the CPH, FNCB, Wells Fargo and others. In May 1976, the district court presiding over the conservatorship proceeding approved the liquidation of the Bank pursuant to the terms of the BFSA.
A dispute arose regarding the provisions of the BFSA, and a trial was held before the bankruptcy court to determine the effect of the compromise settlement. The bankruptcy court “revised, reformed and interpreted” the Settlement Agreement and sustained the Trustee’s objection to the CPH’s claim against Bancorp’s estate in bankruptcy. The court’s order was affirmed by the district court, and this appeal followed. We reverse.
DISCUSSION
I. Choice of Law
Both the bankruptcy court and the district court determined that the Settlement Agreement is a contract. If so, it is to be construed under the laws of California. The CPH contend, however, that federal law applies, because the Settlement Agreement is a United States government contract, citing United States v. County of Allegheny, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944) and Girard Trust Co. v. United States, 149 F.2d 872, 874 (3rd Cir. 1945). The cited cases are distinguishable, however, because each involved an agreement to which the United States government was a party. The government is not a party to the Settlement Agreement, and we have found no authority characterizing such an agreement as a “government contract”. We therefore reject the CPH’s argument that federal law governs the interpretation of the instrument in question.
*1333 Alternatively, the CPH argue that the district court’s order in the conservator-ship proceeding approving liquidation of the Bank transformed the agreement into a consent decree that must be interpreted under federal law. This argument is without merit. The major purpose of the agreement was to compromise the CPH’s claim in bankruptcy. The district court in the conservatorship action had no jurisdiction to order such a compromise, because § 2(a)(2) of the Bankruptcy Act, former 11 U.S.C. § 11, vests the bankruptcy court with exclusive jurisdiction to determine the amount of the CPH’s claim against the estate in bankruptcy. See Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 483, 60 S.Ct. 628, 84 L.Ed. 876 (1940). In BFSA § 2.1(b), the parties conditioned the effectiveness of their agreement on the issuance of an order in the conservatorship action approving the liquidation of the Bank, Bancorp’s major asset. That order did not purport, however, to govern the CPH’s claim against Ban-corp’s estate. The parties’ agreement, rather than the order in the conservatorship action, is the primary source of their rights and obligations. Therefore, the Settlement Agreement is a contract and must be construed under the laws of California.
II. Reformation or Interpretation
The bankruptcy court found that “[s]ec-tions 5(a) and 6.2(b) of the Bank Fund Settlement Agreement, as amended, are ambiguous and through mistake and accident fail to express the mutual intention of the parties. The Bank Fund Settlement Agreement, as amended, shall be revised, reformed and interpreted to conform to the mutual intention of the parties.”[1]
Initially, we note that with regard to a single contractual provision, the processes of “interpretation” on the one hand, and of “revision” or “reformation” on the other hand are mutually exclusive. The former requires the interpreter to derive meaning from the written word, while the latter is invoked when the written word fails to express the parties’ actual agreement. See A. Corbin, Contracts § 540 (1960).
A. Reformation
Under California law, a written instrument is presumed to express the true intent of the parties. See Security First Nat. Trust & Sav. Bank v. Loftus, 129 Cal. App. 650, 19 P.2d 297 (1933). Reformation or revision on the ground of mutual mistake (the only ground asserted here) requires clear and convincing evidence of the alleged mistake. See e. g., Taff v. Atlas Assur. Co., 58 Cal.App.2d 696, 137 P.2d 483 (1943).
This court has said that a lower court’s finding of a mutual mistake justify *1334 ing reformation is “based on the ‘fact-finding tribunal’s experience with the mainsprings of human conduct,’ ” and is thus reviewed under the “clearly erroneous” standard. See Lundgren v. Freeman, 307 F.2d 104, 115 (9th Cir. 1962), quoting Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). A finding of fact is clearly erroneous when “the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); United States v. Missouri River Breaks Hunt Club, 641 F.2d 689, 694 (9th Cir. 1981). Here we are left with such a conviction.
None of the pleadings before the bankruptcy court contained a request for reformation or revision. Instead, both parties asked the court to interpret the Settlement Agreement as written. A review of the voluminous transcript of the bankruptcy proceeding reveals not only that the reformation/revision issue was never raised, but also that neither party alleged the mutual mistake that, under California law, would be the proper ground for revising the contract at issue here. See California Civil Code § 3399. In short, there is nothing in the record to support the conclusion that the Settlement Agreement, as written, fails to express the mutual intention of the parties. To the extent the bankruptcy court found to the contrary, that finding is clearly erroneous.[2]
B. Interpretation
The interpretation of a contract presents a question of law, and this court “is not bound by the findings of the trial court.” Republic Pictures Corp. v. Rogers, 213 F.2d 662, 665 (9th Cir.), cert. denied, 348 U.S. 858, 75 S.Ct. 83, 99 L.Ed. 676 (1954).
The CPH contend that, to the extent that the bankruptcy court purported to interpret the Settlement Agreement, the court erred in three respects: (1) in defining “interest earned”; (2) in allocating the cost of settling a tax claim; and (3) in construing § 6.2(b)(iv) of the agreement.
1. “Interest earned”
The CPH’s first and primary contention on appeal is that the lower court erred in interpreting “interest earned” as used in BFSA § 5(c)(iii). That section provides that “the following amounts will not be treated as amounts received by CPH: . . . (iii) The pro rata share of CPH of the interest earned by the Bank Fund.”
Under the BFSA, payments to the CPH out of the Bank Fund reduce their claim against the estate in bankruptcy. Prior to distribution of the Bank Fund, however, the $12.2 million was invested in interest-bearing Treasury bills and certificates of deposit. Under § 5(c)(iii), the CPH’s claim in bankruptcy is not reduced by its share of that interest.
The bankruptcy court determined that “interest earned” is an ambiguous expression, because it could refer either to net or to gross interest. The court therefore admitted parol evidence to resolve the ambiguity, and held that the CPH’s claim in bankruptcy should be reduced by excluding *1335 from “interest earned” the CPH’s pro rata share of the Conservator’s administrative expenses and legal fees, as well as their share of the investment custodian fees charged by Security National Bank, Wells Fargo Bank, and Riggs National Bank for investing the Bank Fund.
The threshold question is whether the court erred in admitting parol evidence to interpret the BFSA. The applicability of the parol evidence rule hinges on a preliminary determination that the written contract was “intended by the parties as a final expression of their agreement with respect to such terms as are included therein.” California Code of Civil Procedure § 1856(a). The question whether the written contract is such a final expression is a legal issue for the court. California Code of Civil Procedure § 1856(d). Accordingly, we turn to that question.
Section 15(a) of the Settlement Agreement states that “[t]his Settlement Agreement constitutes the entire agreement among the parties and supersedes all prior or contemporaneous agreements and understandings of the parties.” The Settlement Agreement was the product of numerous drafts and lengthy negotiations among sophisticated parties represented by both attorneys and accountants. In such a context we take § 15(a) at its face value and hold that the Settlement Agreement was intended as the final expression of the parties’ agreement.
Under California law, parol evidence is admissible to construe a facially unambiguous contract if the proffered interpretation is one to which the written agreement is “reasonably susceptible.” Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 37, 442 P.2d 641, 644, 69 Cal.Rptr. 561, 564 (1968). We agree that “interest earned” as used in § 5(c)(iii) may reasonably be interpreted as either a net or a gross concept. Because the bankruptcy court’s definition of “net interest” is not one to which the language of the agreement is reasonably susceptible, however, the judgment must be reversed.
“Gross interest earned” would mean the amount actually received on the invested Bank Fund, without regard to the expenses incurred in generating that amount. By contrast, “net interest earned” would take account of the investment custodian fees that were a necessary cost of producing the interest. It would not include, however, the Conservator’s administrative expenses or legal fees, because these expenses were not costs of producing the interest. The CPH were never forewarned that they would be charged with these expenses. Nor were the expenses included within the definition of “interest” used in the periodic Statements of the Conservatorship that were circulated to those holding a financial interest in the earnings of the Bank Fund. Because the language of the BFSA is not reasonably susceptible of the bankruptcy court’s interpretation, the judgment must be reversed. On remand, the bankruptcy court may make a determination whether or not the term “interest earned” was intended to be a gross or a net concept for purposes of deducting necessary costs of producing the interest, such as investment custodian fees. In no event, however, is the language susceptible to the interpretation that Conservator’s administrative expenses or legal fees are costs of producing the interest or are properly chargeable to CPH.
2. Settlement of the tax claim
We turn next to the bankruptcy court’s treatment of the Conservator’s payment of $137,500 to the Internal Revenue Service in settlement of a tax claim against the Bank. The Bankruptcy court ruled that the payment was in the best interest of all parties, but that the CPH and the Trustee had reached no agreement as to the effect of the payment on the CPH’s claim in the bankruptcy proceeding. The court treated the payment as an expense of the Bank *1336 Fund, and reduced the CPH’s claim in bankruptcy by their pro rata share of the $137,500.
The BFSA does not specifically provide for payment of the I.R.S. claim. As we held above, the Settlement Agreement represents the parties’ entire agreement with respect to terms included therein. Consistent with our earlier analysis, the I.R.S. settlement could not be charged against the CPH under a net concept of “interest earned”, because the payment of the $137,500 did not produce interest on the Bank Fund. Under BFSA § 5(a)(i), the CPH’s claim against the estate in bankruptcy is reduced only by amounts received by the CPH out of the Bank Fund. Because the CPH never received the I.R.S. settlement money, the bankruptcy court erred in reducing the CPH’s claim by their pro rata share of the $137,500.
3. Interpreting BFSA § 6.2(b)(iv)
The CPH’s final contention is that the bankruptcy court erred in interpreting § 6.2(b)(iv) of the Settlement Agreement. As set out in footnote 1, that section provides an increase in the cap on the CPH’s total recovery by an amount equal to 7% interest on the $1.25 million to be delivered to the CPH as their share of director and officer recovery. The bankruptcy court ruled that this 7% annual increase was not to take effect until the original 80% cap was exhausted. Because that interpretation is inconsistent with the purpose of § 6.2(b)(iv)’s 7% increase, the bankruptcy court’s ruling cannot stand.
Section 6.2(b)(v) vests the Trustee with exclusive control of the litigation against the former directors and officers of Ban-corp and of the Bank, including control over the dispersal of any funds received in settlement of those claims. Section 6.2(b)(iv)’s 7% increase in the cap was thus intended to provide the Trustee with an incentive to deliver promptly to the CPH their rightful share of the director and officer recovery. Concomitantly, the 7% increase compensates the CPH for their inability to use the funds to which they are entitled, but which remain in the Trustee’s control. Both of these purposes would be frustrated by the bankruptcy court’s ruling that the 7% increase is not to commence until the original cap is exhausted.
The judgment is reversed, and the case is remanded to the district court with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.

. Section 5(a) of the BFSA states:
(a) CPH Retained Claim
(i) A claim against Bancorp by CPH shall be allowed in the Bankruptcy Proceeding in an amount calculated by subtracting the sum of the amounts received by CPH in the Initial Delivery and in all deliveries out of the Reserves from the amount of the CPH Total Claim; except
(ii) No payment or delivery of any amount shall be made to CPH from the estate of Bancorp which, when added to any amounts previously received by CPH in the Initial Delivery and in all deliveries out of the Reserves or the estate of Bancorp exceeds 80% of the Aggregate Principal Amount.
Section 6.2(b) provides, in relevant part, that:
(iii) All amounts recovered in excess of the amounts delivered pursuant to Section 6.2(b)(i) and (ii) shall be allocated between the Trustee and CPH on an equal basis, i. e., 50% to the Trustee, 50% to CPH; provided that any amounts payable to CPH pursuant to this Section 6.2(b)(iii) shall be applied against any amounts otherwise payable to CPH from the estate of Bancorp and shall be subject to the limitation contained in Section 5(a)(ii) above.
(iv)In the event that the amount referred to in Section 6.2(b)(i) above has not been distributed to CPH on or before July 1, 1976, the limitation contained in Section 5(a)(ii) above shall be increased by interest on said amount at the rate of seven percent (7%) per annum beginning July 1, 1976; provided that payment of the amount of such increase shall be made only from the CPH share of any recovery pursuant to Section 6.2(b)(iii).

. The Trustee argues that BFSA § 5(a)(ii) was revised in the CPH’s favor, thus estopping them from contesting the propriety of the lower court’s decision to revise the agreement. As set out above, § 5(a)(ii) limits the CPH’s recovery to 80% of their total claim against Ban-corp’s estate in bankruptcy. The parties agree that the 80% limit should be raised to 90% to include $1.25 million that the CPH received as their share of recovery from Bancorp’s and the Bank’s former directors and officers in settlement of alleged fraud and Security Act violations. The bankruptcy court “revised” the Settlement Agreement to conform to this understanding.
Section 6.2(b)(i) provides, however, that including the $1.25 million in director and officer recovery, the CPH’s total receipts under the BFSA are not to exceed 90% of its claim against the estate in bankruptcy. In our view, this provision unambiguously increases the limit on recovery (or “cap”) from 80% to 90% to include the $1.25 million. It was unnecessary, therefore, to revise the agreement in favor of the CPH.