SUN STUDS, INC., an Oregon Corp.,
Appellee/Cross-Appellant,

v.

APPLIED THEORY ASSOCIATES, INC., an Oregon Corp., and Applied Theory, Inc., an Oregon Corp., Appellants/Cross-Appellees.

Appeal Nos. 84–986, 84–1025, 84–1059 and 84–1091.

United States Court of Appeals, Federal Circuit.

Sept. 13, 1985.

J. Pierre Kolisch, Kolisch, Hartwell, Dickinson and Anderson, Portland, Or., argued for appellants. With him on brief were Peter E. Heuser and Robert D. Varitz, Portland, Or.

Don H. Marmaduke, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., argued for appellee. With him on brief were Barbee B. Lyon and Mark L. Cushing, Portland, Or. Also on brief were William A. Birdwell and William O. Geny, Chernoff, Vilhauer, McClung, Birdwell and Stenzel, Portland, Or.

Before BALDWIN, KASHIWA and NIES, Circuit Judges.

BALDWIN, Circuit Judge.

These consolidated appeals from the United States District Court for the District of Oregon arise out of a motion for summary judgment concerning an alleged agreement to settle a lawsuit and cross motions to disqualify the parties' respective attorneys.[1] We affirm that court's February 29, 1984 judgment which granted appellee's motion for summary judgment on the ground that the alleged settlement is void under the Oregon Statute of Frauds, O.R.S. 41.580. We affirm in part and reverse in part the March 30, 1984 judgment which granted both parties' cross motions to dis-

---

1. By order of this court, the four appeals in this case were consolidated, and Applied Theory Associates, Inc. and Applied Theory, Inc. were designated appellants. Appeal Nos. 84–986 and 84–1091 involve the summary judgment issue, and Appeal Nos. 84–1025 and 84–1059 involve the disqualification of both sets of patent counsel.

qualify counsel. We first discuss the summary judgment on the statute of frauds issue and then the disqualification issues.

## I. *Summary Judgment on the Statute of Frauds*

Plaintiff-appellee Sun Studs, Inc. (Sun Studs) sued defendant-appellant Applied Theory Associates, Inc. (ATA) in August 1978, for patent infringement, breach of contract, and misappropriation of trade secrets. ATA denied infringement and counterclaimed that Sun Studs' patents were invalid.

Extensive discovery took place until September 1981, when settlement negotiations began. For the next year and a half the parties attempted to reach an agreement. A problem in reaching an acceptable settlement was that Sun Studs had a separate exclusive licensing agreement, involving one of the same patents in suit, with a third party, Albany International Industries, Inc. (Albany). During negotiations, Daniel P. Chernoff, Sun Studs' patent attorney, opined that it was necessary to obtain Albany's assent to license ATA before final settlement. In late 1982, the Coe Manufacturing Co., Inc. (Coe), a major competitor of ATA's parent corporation,[2] acquired Albany's exclusive patent license rights. Part of the proposed settlement between Sun Studs and ATA required Sun Studs to obtain for ATA a sublicense of the patent to which Coe now had exclusive rights.

In the beginning of January 1983, as a result of Coe's acquisition of the Albany license, Chernoff reviewed the Albany license agreement and changed his opinion with respect to the necessity of obtaining Albany/Coe's assent to the granting of a sublicense to ATA/ATI. Chernoff now believed that it was unnecessary to obtain Coe's assent because under the terms of that license agreement, Sun Studs could force Coe to grant ATA/ATI a non-exclusive license.

That news was welcomed by ATA/ATI, and Chernoff then prepared a new settlement proposal entitled "Sun Studs— ATA/USNR Agreement Outline of Major Terms." On January 19, 1983, Chernoff sent a signed letter along with a copy of the Agreement Outline bearing the same date to Richard Ward, chairman of the board of ATI and president of USNR (ATI had become owner of all ATA stock), Fred Sohn, president and owner of Sun Studs, Larry Hunter, president of ATA, and A. Allen Franzke, ATA's general attorney. The letter read in part:

> Enclosed for your perusal is an outline of the major terms of the agreement which we now propose to settle the long-standing controversy.... However, Fred [Sohn] has not seen this written outline, and it may be that he will have some comments or modifications to it....
>
> Fred and I look forward to meeting with you this coming Friday at 9:30 a.m. in our offices.

Paragraph 4 of the Agreement Outline provides that Sun Studs would arrange for a grant to ATA of sublicense rights from Coe under Sun Studs' patents for automated sawmills. Paragraph 5(a) provides for a grant by Sun Studs to USNR/ATA of license rights under Sun Studs' patents for automated lathe charger systems. Paragraph 5(c) provides that USNR/ATA would agree not to infringe Sun Studs' patents for the remainder of the lives of the patents.

On January 21, 1983, Sohn, Ward, and Chernoff met to discuss the proposed settlement outline. Sun Studs contends that the meeting consisted of negotiations only and no final agreement was reached. ATA/ATI argue that a final settlement was reached.

Chernoff notified Ward on February 1, 1983 that there was no settlement between the parties because Sun Studs had, after the conference of January 21, 1983, made a better arrangement with Coe, and Coe was unwilling to grant ATA/ATI a sublicense.

---

**2.** U.S. Natural Resources (USNR) became the new owner of ATA; and, a new party defendant, Applied Theory, Inc. (ATI), became involved, which was in turn owned through another corporation by USNR. Defendants-Appellees will be referred to collectively as "ATA/ATI."

When ATA/ATI learned that Sun Studs was reneging on the alleged settlement, they retained J. Pierre Kolisch and his firm (the Kolisch firm) as new patent counsel. A supplemental answer was filed alleging that a settlement agreement had been reached, and the court was requested to dismiss Sun Studs' suit and to order specific performance of the settlement agreement. Sun Studs denied that any enforceable settlement had been reached.

ATA/ATI sought a bench trial of the settlement issue but Sun Studs prevailed on its request for a jury trial. After ten months of discovery, the trial was set for February 14, 1984. On January 17, 1984, Sun Studs moved for summary judgment of the settlement issue on the grounds that the alleged settlement was barred by the Oregon Statute of Frauds.

On February 29, 1984, the trial court granted Sun Studs' motion for summary judgment concluding that the alleged agreement was void under the Oregon Statute of Frauds, O.R.S. 41.580.[3] The court noted that the provisions arranging for the grants of license and sublicense rights and the commitment not to infringe the patents have neither specific termination dates nor a provision for earlier termination. Determining that the provisions would be effective until 1990 and 1991 when the patents expire, the court concluded that the agreement would not be capable of performance within one year and, thus, would fall within the statute. The court then found that Chernoff's signature on the cover letter did not satisfy the statute's subscription requirement.

Upon motion by ATA/ATI, and upon a finding of no just reason for delay, the trial court ordered entry of final judgment on ATA/ATI's settlement claim pursuant to rule 54(b) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.). Our jurisdiction is found in 28 U.S.C. § 1295(a).

On appeal, ATA/ATI contend that the trial court erroneously granted the summary judgment motion. ATA/ATI argue that the trial court erred by basing its decision on the Oregon Statute of Frauds because an agreement to settle a federal case is controlled by federal, not state law. Also, it is contended that the parties agreed on all the terms of the settlement at the January 21, 1983 meeting and it was incumbent upon Sun Studs to communicate that there was no settlement until a formal settlement document was signed. ATA/ATI further contend that the unsigned Agreement Outline was specifically referred to in the January 19, 1984 letter, and therefore was incorporated by the letter. Upon acceptance of the settlement proposal by ATA/ATI, a binding agreement arose. Lastly, ATA/ATI argue that all of the terms of the Agreement Outline could be performed within a year.

In reviewing a grant of summary judgment, we must determine whether there existed any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *See* rule 56(c), Fed.R.Civ.P. The movant bears the burden of demonstrating the absence of all genuine issues of material fact while the court views the evidence in a light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor.

*Choice of Law*

We must first decide what is the applicable substantive law. ATA/ATI contend that under the rationale of *Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 223 USPQ 1074 (Fed.Cir.1984), this court should apply its own body of law in deciding whether the alleged settlement agreement is enforceable. According to ATA/ATI, "[i]ssues regarding the construction and validity of a settlement of a patent lawsuit constitute substantive patent law issues which are of

---

3. O.R.S. 41.580 provides in relevant part:

In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by his lawfully authorized agent;

evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases proscribed by law:

(1) An agreement that by its terms is not to be performed within a year from the making.

national concern to patent litigants." The further argument is that Congress intended, by its passage of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (1982) (FCIA), that there should be uniformity and stability in the law relating to terminations of patent lawsuits. Alternatively, ATA/ATI rely on certain decisions which, they assert, apply federal law rather than state law. We disagree with ATA/ATI's contentions.

■ It is already well settled that the nature of the legal issue, rather than the court's statutory basis for subject matter jurisdiction, determines the choice of law. 1A Moore's Federal Practice ¶ 0.305[3] (2d ed. 1985). In *Atari,* this court emphasized that the district courts should be free to follow the guidance of their regional circuits in all but the substantive law fields assigned exclusively to this court. In reviewing a number of our earlier decisions, we said:

> [W]e deem it appropriate here to decide non-patent matters in the light of the problems faced by the district court from which each count originated, including the law there applicable. In this matter, we desire to avoid exacerbating the problem of intercircuit conflicts in non-patent areas. A district court judge should not be expected to look over his shoulder to the law in this circuit, save as to those claims over which our subject matter jurisdiction is exclusive.

*Id.* at 1439, 223 USPQ at 1087 (footnote omitted) (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 909, 223 USPQ 982, 986 (Fed.Cir.1984)); *cf. American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1366–67, 220 USPQ 763, 775–76 (Fed.Cir.1984) (applying the law of the originating circuit in determining the necessity of showing relevant market to establish a Sherman Act section 2 violation).

■ The issue of whether the alleged settlement agreement in the present case is enforceable is not a patent issue. Although the alleged agreement concerns various patent claims, the real questions at issue here—the kind of writing and subscription required to make a settlement agreement enforceable—have nothing *per se* to do with patent law. Those types of questions are not the types envisioned by Congress when it passed the FCIA in order to provide uniformity for substantive patent issues. Accordingly, we apply the law of the Ninth Circuit including its precedent on choice of applicable law.

The Ninth Circuit has held that a settlement agreement entered into between private parties is to be resolved under state law rather than federal law. *See, e.g., In re Beverly Hills Bancorp,* 649 F.2d 1329, 1332–33 (9th Cir.1981) (settlement agreement in a bankruptcy case in which the United States is not a party is a contract that is to be construed under California law). Because Sun Studs and ATA/ATI are based in Oregon and all acts took place in Oregon, we look to the law of that forum. Therefore, we will apply Oregon law in reviewing the trial court's summary judgment decision.

## Statute of Frauds

Our analysis is restricted to whether the trial court properly granted summary judgment on the ground that the alleged agreement is void under the Oregon Statute of Frauds, O.R.S. 41.580. The trial court reasoned that the issue of whether the alleged agreement is void under the Oregon Statute of Frauds is solely a question of law and therefore appropriate for disposition by summary judgment. We agree.

## Subscription Requirement

■ O.R.S. 41.580 requires that a writing must be "subscribed by the party to be charged, or by his lawfully authorized agent." In *Commercial Credit Corp. v. Marden,* 155 Or. 29, 62 P.2d 573 (1936), the Oregon Supreme Court examined the legislative history of O.R.S. 41.580. The plaintiffs brought the action on a bond alleged to have been executed by the defendants as sureties, to avoid attachment of defendants' property. The signatures of the defendants did not appear in the space provided for them immediately after the body of the bond, but only appeared at the end of an affidavit (attesting to defendants' quali-

fications as sureties) following the bond. In reviewing the history of O.R.S. 41.580, the court noted that the Oregon Legislature substituted the word "subscribed" for "signed" in the statute in 1862. The court concluded that the intent of the legislature must have been that the signature of the party to be bound should be affixed at the end of the agreement or memorandum, and further that "the word 'subscribed' as used in the Oregon statute is not equivalent to or interchangeable with the word signed." *Id.* at 35–38, 62 P.2d at 575–76;[4] *accord, Turner v. Clark,* 277 Or. 307, 560 P.2d 624 (1977); *Atckison v. Triplett,* 244 Or. 475, 419 P.2d 4, 5 (1966). In *Commercial Credit,* the court held that from an examination of the bond and the accompanying affidavit alone, it could not be said that the defendants subscribed their names to the bond as required by the statute. The agreement was within the statute of frauds, and hence void.

ATA/ATI argue that there are important differences between *Commercial Credit* and the present case because the affidavit in *Commercial Credit* was dated five days later than the unsigned surety bond and the affidavit neither made reference to the bond nor sought to incorporate it by reference. A further distinction pointed to is that the surety bond had blank lines for signatures at its end whereas there are no blank lines for signature at the end of the Agreement Outline. We see, however, no reason why the requirements of *Commercial Credit* do not apply in this case, and conclude that ATA/ATI have failed to raise a genuine issue of material fact which would preclude the district court from concluding that as a matter of law the subscription requirement was not satisfied.

The undisputed facts here are that the unsigned Agreement Outline arrived in the same envelope as the signed letter from Chernoff. The letter did not incorporate the Agreement Outline by reference. The trial court aptly characterized the latter as a cover letter. The language of the letter indicates that it was not a contract, but rather that the drafting and execution of a final settlement agreement was to take place some time in the future. The letter seems to identify Sun Studs' president, Sohn, as the party with authority to execute a settlement agreement but notes that Sohn had not even seen the outline. Finally, the Agreement Outline reads on its face as simply that—an *outline* —which has not been put in final form.

The trial court also correctly distinguished the case at bar from *Pyle v. Wolf Corp.,* 354 F.Supp. 346, 347 (D.Or.1972). In *Pyle,* the court held that a signed cover letter together with an unsigned draft of an agreement was sufficient to comply with Oregon's Uniform Commercial Code (UCC) Statute of Frauds. Unlike that in the present case, however, the draft agreement there was merely meant to memorialize an earlier oral agreement consummated between the parties. Also, Oregon's UCC Statute of Frauds (O.R.S. 71.2060 and O.R.S. 78.3190), which liberally requires only a "signing" rather than a "subscription," is inapplicable in the present case. The difference between "signed" and "subscribed" was of course emphasized by the Oregon Supreme Court in *Commercial Credit.*

*Capable of Performance Within One Year*

■ O.R.S. 41.580(1) states that an oral contract is void if "by its terms it is not to be performed within a year from the making." A contract that by its own terms is capable of performance within one year is outside the Statute of Frauds and no writing is required. *Duniway v. Wiley,* 85 Or. 86, 166 P. 45, 46 (1917).

■ The trial court determined that O.R.S. 41.580(1) was applicable because the alleged agreement extends for the terms of the patents, contains no provision for earlier termination, and thus by its own terms is not capable of performance within one year. We conclude that ATA/ATI have

---

**4.** Explaining the difference between the two terms, the court said a "signing" can appear anywhere on a document, albeit usually at the bottom, whereas a "subscription" is "limited to a signature at the end of a written instrument." *Id.* at 38, 62 P.2d at 576.

failed to raise a genuine issue of material fact on these points.

ATA/ATI argue that the alleged agreement is outside O.R.S. 41.580(1) because the agreement is of uncertain duration (contending that the licenses would be terminated if ATA/ATI went out of business or did not manufacture devices covered by the licenses) or is capable of performance within one year (speculating that the patents might be extinguished within one year by a court holding of invalidity or a reexamination proceeding). These arguments must be rejected.

The statute applies only to "an agreement that by *its terms* is not to be performed within a year from the making." ATA/ATI have failed to point to any provision in the Agreement Outline which would terminate the grant of license and sublicense rights prior to the 1990 and 1991 expiration dates of the patents. Thus, ATA/ATI's reliance on *Frontier Insurance Agency, Inc. v. Hartford Fire Insurance Co.,* 262 Or. 470, 499 P.2d 1302 (1972), for the proposition that termination according to the terms of the contract within one year is equivalent to performance within one year, is misplaced. There simply is *no provision* in the Agreement Outline for termination.

Moreover, the Supreme Court and the Ninth Circuit have applied the Statute of Frauds to oral agreements which grant a license under a patent whose remaining term is more than one year. *See, e.g., Packet Co. v. Sickles,* 72 U.S. (5 Wall.) 580, 595, 18 L.Ed. 550 (1867); *Schick Service, Inc. v. Jones,* 173 F.2d 969, 975–77, 81 USPQ 60, 65–66 (9th Cir.), *cert. denied,* 338 U.S. 819, 70 S.Ct. 62, 94 L.Ed. 497 (1949).

In conclusion, the trial court correctly determined that the alleged agreement is void under the Oregon Statute of Frauds, O.R.S. 41.580, because there is no sufficient writing and the agreement cannot, by its own terms, be performed within one year. We affirm the trial court's grant of Sun Studs' motion for summary judgment on this issue.

## II. *Disqualification*

The respective parties moved to disqualify each other's patent counsel and the trial court granted both motions. The present appeals are from the trial court's order disqualifying J. Pierre Kolisch and his law firm (Kolisch firm) from representing ATA/ATI, and Daniel P. Chernoff and his law firm (Chernoff firm) from representing Sun Studs. [In a modifying order, the trial court said the Kolisch and Chernoff firms were not disqualified from representing their clients in the present appeals.]

### Facts

The action which Sun Studs filed against ATA included a charge of infringement of three patents: U.S. Patent No. 3,736,968 to Mason and Sohn ('968 patent); U.S. Patent No. 3,746,065 to Mason ('065 patent); U.S. Patent No. 3,852,579 to Sohn, Hunter, and Holmes ('579 patent), and breach of an agreement dated May 21, 1971 between Sun Studs and ATA.

H.C. Mason & Associates, Inc. (HCMA) was hired by Sun Studs to help design an automated sawmill. During the course of that work, HCMA's principal, Howard C. Mason, and Fred Sohn (owner of Sun Studs) made the invention of the '968 patent. Mr. Mason was a client of the Kolisch firm. In 1970, James M. Thomson, then an associate in the Kolisch firm, prepared and filed in the United States Patent and Trademark Office (PTO) the patent application for Mr. Mason naming Mason as sole inventor which resulted in the '968 patent. Upon learning of the preparation of the application, Sun Studs asserted its right to an assignment and to control prosecution of the application. The rights in the application were assigned to Sun Studs before the PTO took any action, and prosecution of the application was taken over by Sun Studs' patent counsel, Chernoff. Inventorship was eventually corrected to include Sohn as a joint inventor. Thus, the Kolisch firm prepared and filed the patent application while the Chernoff firm prosecuted the application to issuance.

Mason made the invention of the '065 patent during the course of his work at

HCMA for Sun Studs. The application which matured into the '065 patent was prepared, filed in 1971, and prosecuted through issuance by Thomson of the Kolisch firm on behalf of Mason. Several years after issuance, the '065 patent was assigned to Sun Studs.

The subject matter of the '579 patent arose from consulting work done by Larry C. Hunter (president of ATA) for Sun Studs. Sun Studs had engaged Hunter in 1971 to develop computer-controlled sawmill equipment. ATA retained Dr. J.F. Holmes as a consultant to assist it on the Sun Studs project.

Sun Studs requested Chernoff to draw up agreements with ATA and other independent contractors to protect Sun Studs' interests in inventions and confidential information arising from these projects. Chernoff met with Sohn and Hunter in February 1971 and this was Chernoff's first introduction to Hunter. The business arrangement that was worked out at the meeting was that Sun Studs would pay for and become the sole owner of any invention and patent which might issue as a result of the development work, and ATA and Holmes would receive 50 percent of any royalties paid by licensees to Sun Studs. It was also ATA's understanding that if Sun Studs failed to commercially exploit the invention, ATA had a reversionary interest in any patent which might have issued. Sohn suggested to Hunter that the understanding reached between Sun Studs and ATA be set forth in a written agreement to be prepared by his patent lawyer, Chernoff. Hunter agreed. Chernoff prepared a draft agreement which did not contain a clause giving ATA a reversionary interest. Hunter refused to sign the agreement. Chernoff revised the agreement to include a reversionary interest clause and on May 21, 1971 the parties executed the agreement, Hunter for ATA, and Sohn for Sun Studs.

The agreement contained an invention rights clause under which title to all domestic and foreign patents on inventions arising out of the consulting work under the contract would be assigned to Sun Studs. ATA also agreed to disclose such inventions to Sun Studs and to fully assist Sun Studs in obtaining patents for Sun Studs' exclusive benefit. It was under this agreement that the invention of the '579 patent was developed.

Although Hunter knew that Chernoff was Sun Studs' patent attorney, and Chernoff did not bill ATA for his services, Hunter says it was his belief that Chernoff was representing both parties. According to Hunter, Chernoff never suggested to Hunter that Chernoff was solely representing Sun Studs or that ATA should have its own counsel to protect its interests. Chernoff says that he believed that he was acting solely on behalf of Sun Studs and that neither Sohn nor Hunter requested that he act on behalf of ATA or Hunter. While Hunter did not bring an attorney with him to the meeting, Chernoff understood that Hunter and ATA were represented by a general attorney named Robert Mix,[5] and that Hunter had simply elected not to have Mix present.

The patent application which resulted in the '579 patent was prepared and prosecuted by the Chernoff firm. The named inventors were Sohn of Sun Studs, as well as Hunter and Holmes. The inventors executed the oath as inventors which included an appointment of Daniel P. Chernoff and members of his firm as: "our attorneys, jointly and individually, to prosecute this application and to transact all business in the Patent Office connected therewith." During the course of the prosecution, Chernoff consulted with Hunter concerning the technical aspects of the case. In response to a rejection of the claims based on prior art, Chernoff made certain representations to the PTO to distinguish the invention sought to be patented from the prior art. Thereafter, the claims of the patent application were allowed.

5. Referring to the notation "Bob Mix *lwyr*" found in his notes of the meeting, Chernoff says in his affidavit that he believes he was told that ATA was generally represented by Mix.

*Representation and District Court Proceedings*

Even before commencement of the suit on August 3, 1978, Sun Studs had objected to the Kolisch firm giving an infringement opinion to ATA with regard to the '968 and '065 patents. The Kolisch firm denied any conflict of interest, noting that its opinion was directed only to the infringement question and not to validity. When Sun Studs, represented by Chernoff, commenced the action in 1978, ATA retained the patent law firm of Dowrey & Cross to defend it.

In January 1979 (the trial date being set for February), ATA/ATI filed a motion to disqualify the Chernoff firm, arguing that Chernoff represented Hunter and ATA in drafting the May 21, 1971 agreement and in prosecuting the application for the '579 patent. Chernoff defended on the grounds that he only acted as Sun Studs' attorney and never represented ATA or Hunter. In a January 25, 1979 order, the court (Judge Belloni) denied ATA's motion, coming, as it did, at a time when the parties were ready for trial. The order further said that it was up to Chernoff to decide whether or not he should continue representing Sun Studs, and that the ruling was not intended to imply any ethical breach on Chernoff's part nor absolve him from the consequences if he made the wrong decision on continuing to represent Sun Studs.

Hunter then filed a letter of complaint with the Oregon State Bar. Chernoff answered by again saying that he acted solely as the attorney for Sun Studs and that Hunter and ATA were not his clients. The Oregon State Bar declined to act on the complaint, stating that "its investigation failed to disclose any evidence of professional misconduct." Dowrey & Cross withdrew as counsel for ATA/ATI on November 22, 1982 and on March 3, 1983, the Kolisch firm entered the case. Sun Studs moved on March 16, 1983 to disqualify the Kolisch firm. At an April 14, 1983 hearing, Sun Studs withdrew its motion, based on the court's decision to grant trial only on the settlement issue, but Sun Studs reserved the right to renew the motion if matters other than settlement of the litigation arose. At a February 6, 1984 status conference, Sun Studs learned of the trial judge's tentative ruling against ATA/ATI on the settlement claim, and on February 7 renewed its motion to disqualify the Kolisch firm. On March 6, 1984 ATA/ATI again moved to disqualify the Chernoff firm.

In a March 30, 1984 opinion and order, the trial court (Judge Redden) granted both parties' cross motions to disqualify. On the disqualification of the Kolisch firm, the trial court said that at all material times, Mason was the client of the Kolisch firm. Although Mason said he did not object to Kolisch representing ATA, and ATA said it would not attack the validity of the '968 and '065 patents on 35 U.S.C. § 112 grounds (disclosure requirement and failure to point out and distinctly claim), the trial court said the ethical problems of the case were not thereby solved. The problem perceived by the trial court was that the Kolisch firm, who prosecuted the application which matured into the '065 patent, would now be arguing to a jury that the patent was invalid for obviousness. The court concluded:

> While the Kolisch firm is not taking a position which is adverse to a former client, it is taking a position which is totally contrary to the work it performed for its former client. It is now questioning the validity of one of the patents it helped create. I find that the impropriety of its continued representation of ATA is such that disqualification is warranted.

As for the Chernoff firm, the trial court said:

> Whether or not Chernoff represented ATA and Hunter in 1971 is disputed. The best that can be said is that an "inherent ambiguity" exists as to whether he acted solely on behalf of Sun Studs.... Because of this ambiguity, I find that Chernoff should not represent Sun Studs on its breach of contract claim against ATA. (Citation omitted.]

> This same ambiguity exists regarding the patent claim. Although Chernoff argues he did not represent Hunter and

ATA, it is undisputed that Hunter signed a power of attorney appointing Chernoff to prosecute the patent for him. It is also undisputed that Chernoff made certain statements to the Patent Office that he must now disavow or distinguish in order to prove ATA has infringed the '579 patent. The appearance of impropriety is as strong here as it is in the case of the Kolisch firm.

We accept jurisdiction over the disqualification order under 28 U.S.C. § 1292(c)(1), the district court having certified that the order involves a controlling question of law and that certification would materially advance the interests of judicial economy and of the litigants. *Cf. Richardson-Merrell, Inc. v. Koller,* —— U.S. ——, 105 S.Ct. 2757, 2766, 86 L.Ed.2d 340 (1985) (holding that disqualification orders in civil cases are not collateral orders subject to appeal as "final judgments" within the meaning of 28 U.S.C. § 1291).

*Choice of Law*

■ These appeals are from district court orders disqualifying attorneys. In *Panduit Corp. v. All States Plastic Manufacturing Co.,* 744 F.2d 1564, 1572–76, 223 USPQ 465, 469–72 (Fed.Cir.1984), this court concluded that procedural matters that are not unique to patent issues will be reviewed under the law of the particular regional circuit court where appeals from the district court would normally lie. *Id.* at 1574–75, 223 USPQ at 471; *accord, Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 909, 223 USPQ 982, 986 (Fed. Cir.1984); *Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422, 1438–40, 223 USPQ 1047, 1086–87 (Fed.Cir.1984); *W.L. Gore & Associates, Inc. v. International Medical Prosthetics Research Associates,* 745 F.2d 1463, 1466, 223 USPQ 884, 886 (Fed.Cir. 1984); *In re International Medical Prosthetics Research Associates, Inc.,* 739 F.2d 618, 620 (Fed.Cir.1984). We therefore review the trial court's decisions under the law of the Ninth Circuit.

In the Ninth Circuit, the standards adopted by the district court to govern the conduct of its bar are controlling. *See Unified Sewerage Agency v. Jelco, Inc.,* 646 F.2d 1339 (9th Cir.1981). The District of Oregon has promulgated Local Rule 110–3 which substantially adopts the standards of professional conduct required of members of the Oregon State Bar.

*Standard of Review*

■ An order of the trial court disqualifying counsel will not be disturbed if the record reveals "any sound" basis for the court's action. *Paul E. Iacono Structural Engineer, Inc. v. Humphrey,* 722 F.2d 435, 438 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983); *Gas-A-Tron of Arizona v. Union Oil Company of California,* 534 F.2d 1322, 1325 (9th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). Such an order will be reversed only where it is not based on "articulable principles," *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 658 F.2d 1355, 1361 (9th Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982), or where the court either misperceives the relevant rule of law or abuses its discretion, *Iacono,* 722 F.2d at 438.

*Disqualification of the Kolisch firm*

■ The crux of the problem regarding the Kolisch firm's representation of ATA/ATI in the present litigation is that the Kolisch firm prosecuted the '065 patent application to issuance. The Kolisch firm now wishes, however, to argue to a jury that the '065 patent is invalid for anticipation or obviousness.[6] ATA/ATI raise the threshold argument that Mason, not Sun Studs, was the former client of the Kolisch firm with regard to the '065 patent and thus only Mason could move for disqualification. This argument does not establish that the trial court committed legal error under Ninth Circuit precedent in allowing Sun Studs, the present owner of the patent,[7] to seek disqualification of the Kolisch

6. ATA/ATI have agreed not to attack either of the '065 or '968 patents on § 112 grounds if the Kolisch firm continues to represent it.

7. Sun Studs' ownership is subject to the license granted to Coe.

firm based on the public interest. Indeed, the court could move on its own where it believes that the public interest is implicated.

On the merits, ATA/ATI assert that the Kolisch firm was erroneously disqualified because "it is well recognized that attorneys frequently take positions contrary to their former clients." ATA/ATI also contend that representation by the Kolisch firm does not give the appearance of impropriety. The focus in the case, according to ATA/ATI, should be on whether the Kolisch firm had access to confidential information via its prior representation which would taint the underlying trial with a serious ethical violation. Because Mason and the lawyers involved swore that any information received is now a matter of public record in the form of a patent, and because there is an agreement to attack the '968 and '065 patents only on § 102 and § 103 grounds, ATA/ATI assert there is no improper conduct. We conclude, however, that there was a sound basis for disqualifying the Kolisch firm.

Mason had no independent right to inventions or to prosecute patent applications which he acknowledged were equitably owned by Sun Studs. While no Oregon precedent can be found on the point, we do not believe any court would hold that it is within the bounds of propriety to permit a law firm to assist a client in obtaining a patent which was equitably owned by another and then to lead the attack against the patent's validity once it is transferred to its rightful owner. *Accord, Hooper v. Steelplank Corp.*, 215 USPQ 829 (E.D. Mich.1981). While the Kolisch firm is not taking a position adverse to Mason's present interest, any attack on the patent is totally contrary to its work for Mason as an inventor which at the time inured to Sun Studs' benefit. Contrary to the argument by Kolisch, this situation is not comparable to advancing a legal theory for one client and taking a contrary position for another in unrelated proceedings. The substantial relationship between the prior work and the instant proceedings is admitted. Thus, whether it is theorized that Mason and his counsel must be considered to have been acting for Sun Studs or that public perception of the legal system would be damaged, the impropriety is clear.

ATA/ATI say that disqualification would work a great hardship on them as they would have to go out of state for counsel. This argument does not persuade us that the district court abused its discretion. Considering that Sun Studs objected to the Kolisch firm's representation of ATA regarding the patent issues even before the present action was commenced, and that within two weeks of Kolisch's March 3, 1983 entry into the case, Sun Studs moved to disqualify, we discern no equities in ATA/ATI's favor.

In sum, ATA/ATI have failed to show legal error or an abuse of discretion by the district court. Therefore, we affirm that part of the judgment disqualifying the Kolisch firm.

*Disqualification of the Chernoff firm*

■ The district court disqualified the Chernoff firm on the ground that the Chernoff representation gave rise to an appearance of impropriety. It found an "inherent ambiguity" as to whether Chernoff solely represented Sun Studs or additionally represented ATA and Hunter in (1) negotiating and consummating the May 21, 1971 agreement which contained the invention rights clause and (2) securing the '579 patent under that invention rights clause.

Sun Studs argues that Chernoff did not represent ATA or Hunter with respect to the agreement, noting the absence of any form of agreement between Chernoff and ATA or Hunter regarding representation, absence of the usual indicia of an attorney-client relationship such as payment of fees and the expectation on Hunter's part of confidentiality, denials from Chernoff and Sohn that Chernoff either was requested or agreed to act as ATA's attorney, Hunter's admitted knowledge that Chernoff was Sun Studs' attorney, and the appearance of the name of ATA's general attorney "Bob Mix" in Chernoff's notes from the February 1971 meeting.

ATA/ATI contend that Hunter was led to believe that Chernoff was acting as Hunter's or ATA's attorney, because Cher-

noff did not expressly tell Hunter that he was not acting as his attorney and did not expressly suggest that ATA should have its own counsel. ATA/ATI also argue that prior representation is established by Hunter's power of attorney to the Chernoff firm for prosecuting the application which resulted in the '579 patent.

We conclude that there was no sound basis for the district court to disqualify the Chernoff firm. Neither Hunter nor ATA could have reasonably expected, from Chernoff's conduct during the negotiations or from Hunter's power of attorney, that Chernoff was acting in such a relationship with them that he would subsequently be precluded from representing Sun Studs' interests with regard to the assignment of rights (the invention rights agreement) and the '579 patent. Since we have been unable to find controlling Ninth Circuit precedent on the specific "relationship" issues raised by Chernoff's representation, we look to more general principles which are consistent with Ninth Circuit law.

■■■ General principles of agency law indicate that a power of attorney does not ipso facto create an attorney-client relationship. For example, one who grants a power of attorney for the benefit of a third person does not create an attorney-client relationship between the grantor and the attorney. The *Restatement (Second) of Agency* § 14H (1958) supports this view:

> One who holds a power created in the form of an agency authority, but given for the benefit of … a third person, is not an agent of the one creating the power.

The relationship between inventor and his assignee's patent counsel who is appointed to prosecute the patent application must be considered in conjunction with the patent laws governing the acquisition and assignment of rights to inventions.

An inventor, who is hired or employed by a company, and who develops an invention in the course of his work which he has agreed to assign to the company, is required to execute whatever papers are necessary for the company's patent counsel to prosecute a patent application on behalf of the company. This procedure is dictated by 35 U.S.C. § 111 (and 37 C.F.R. § 1.41) which requires that the *inventor* must apply for the patent. The patent application must generally contain an oath by the inventor. 37 C.F.R. § 1.51(a)(2). The oath normally includes a power of attorney. Manual of Patent Examining Procedure, Chap. 402 (5th ed. 1983). Even where the invention has been assigned to the company, the inventor must still be the applicant. 37 C.F.R. § 1.46. The assignee may, however, prosecute the application to the exclusion of the inventor. 37 C.F.R. § 1.32. The PTO corresponds with the persons named in the original power of attorney even after an assignment is recorded unless the assignee otherwise requests. 37 C.F.R. § 1.33(a). Thus, it is routine for an inventor to execute an application appointing the attorneys who prepared the application at the direction of the party to whom the application must be assigned and on whose behalf it will be prosecuted. The choice of attorneys, like the filing, is a decision by the assignee, not the inventor. It facilitates payment of filing fees by the assignee and insures that PTO correspondence from the beginning is directed to the assignee's representatives.

Should the company later find it necessary to sue on the patent, it is to be expected that the company would choose its regular patent counsel for representation whom the inventor designated on its behalf. Where the former relationship between the inventor and the patent counsel was solely technical in nature, and where the patent counsel in the former relationship was chosen by and at all times was working on behalf of the company rather than the inventor, it should not serve as automatic disqualification that the defendant is the inventor or a company with which he is associated.[8]

---

**8.** The case *Levin v. Ripple Twist Mills,* 416 F.Supp. 876 (E.D.Pa.1976) is instructive. Levin, the inventor, sought to disqualify two patent attorneys from representing a party Levin accused of patent infringement. Pursuant to Levin's power of attorney, the two patent attorneys prosecuted the application for the patent under an agreement between Levin and the accused

At all relevant times, from the 1971 negotiations to the prosecution of the application for the '579 patent, both Hunter and ATA knew that Chernoff was Sun Studs' patent counsel. As specified in the 1971 agreement, all rights in inventions arising from ATA's consulting work were to be assigned to Sun Studs, and Sun Studs had the exclusive right to file and prosecute patent applications on the inventions "in its sole discretion." Along with its duty to assign the invention rights, ATA had a duty to assist Sun Studs in perfecting its patent rights by executing and delivering assignments, oaths, disclaimers, patent applications, and other instruments. Thus, when Hunter, as a joint inventor with Sohn and Holmes, appointed the Chernoff firm to prosecute the application, he was merely fulfilling his obligation to assist Sun Studs, who had the sole right of prosecution. An appointment of Sun Studs' attorneys to prosecute on his own behalf would have been contrary to the agreement. The Chernoff firm appointment merely evidences the unequivocal understanding of the parties that Sun Studs beneficially owned the patent application which was formally transferred two days later. Thus, Sun Studs was the party who effected Chernoff's appointment, and was the only party with an attorney-client relationship with Chernoff. Hunter's power of attorney was given for the benefit of Sun Studs, not for his own or ATA's benefit.[9]

The trial court in the present case was also influenced by the fact that "Chernoff made certain statements to the PTO [during prosecution] that he must now disavow or distinguish in order to prove ATA has infringed the '579 patent." The trial court's reference to ATA/ATI's assertion that the scope of a claim in the '579 patent is limited by prosecution history estoppel is irrelevant to the disqualification issue. That an attorney distinguishes arguments made to the PTO in a subsequent infringement action is clearly not improper. Chernoff's position is not contrary to Hunter's role as an inventor. On the contrary, Chernoff is seeking to uphold the interest of Hunter and the other joint inventors. The trial court therefore erred by relying on prosecution history estoppel which ATA/ATI expects to assert, as a basis for the Chernoff firm's disqualification.

The equities also weigh against disqualification. The Chernoff firm has represented Sun Studs for over 14 years, has conducted the litigation since its inception in 1978 which includes over three years of discovery, and has undoubtedly acquired knowledge and expertise relating to the technology and events involved in the suit. Further, even ATA/ATI's first motion was made late in the proceedings, despite full knowledge of the facts, and the second, without any new facts, was made five years after the first trial judge had denied such a motion and the Oregon State Bar

---

infringer's predecessor-in-interest, Levin's exclusive licensee. Although Levin was the owner of the patent rights, and had given his power of attorney to the attorneys, he had done so pursuant to his agreement with his exclusive licensee who was *entitled to engage a patent attorney of his choice* to prepare and prosecute the application. The court's view of the situation was that the patent attorneys, who had a preexisting relationship with the licensee, acted as counsel of record only so long as it was in the licensee's interest. The trial court said:

> We cannot presume that the technical attorney-client relationship between Levin and Newman's attorneys induced Levin to share any information which he was not contractually obligated to disclose to them in any event. Under these circumstances, *we do not think the Levin/Edelson-Udell relationship, in connection with the patent prosecution, should be*

considered a *"prior representation"* within the meaning of the substantial relationship test. 416 F.Supp. at 885 (emphasis added).

9. In *Levin,* the court found the relationship between the inventor and the attorney hired by the party in control to be technical in nature, even where the patent rights were owned by the inventor (not the case here), since the inventor had conveyed the right to prepare and prosecute the patent application to another. There was no creation of a prior representation which would conflict with the attorney-client relationship already existing between the patent attorney and the party controlling prosecution. In the present case there was not even a "technical" attorney-client relationship between Chernoff and Hunter, because of the prior agreement that all rights in the invention belonged to Sun Studs.

had found no evidence of professional misconduct.

Based on the foregoing, we hold that there was no sound basis for the trial court to disqualify the Chernoff firm, and accordingly *reverse* that portion of the judgment.

The parties shall bear their own costs.

AFFIRMED–IN–PART, REVERSED–IN–PART.